**Richard J. DANZIG, Secretary of the Navy, Appellant,**

v.

**AEC CORPORATION, Appellee.**

No. 99–1343.

United States Court of Appeals, Federal Circuit.

Sept. 25, 2000

Thomas A. Coulter, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellant. With him on the brief were David W. Ogden, Acting Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief was Ellen M. Evans, Trial Attorney, Office of the General Counsel, Department of the Navy, Naval Facilities, Engineering Command, Washington, DC.

Vivian Katsantonis, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., of McLean, Virginia, argued for appellee. With her on the brief was Robert G. Watt.

Before MICHEL, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

The dispute in this case arose when the government terminated its contract with AEC Corporation for default. The Armed Services Board of Contract Appeals ruled that the default termination was improper, and the government has appealed from that ruling. We reverse and remand for further proceedings.

I

In May 1989, the Navy awarded AEC a contract to complete the construction of a Naval and Marine Corps Reserve Training Center in Miami, Florida. The contract called for AEC to finish the work by October 14, 1990. By late 1990, it was apparent that AEC was behind schedule. AEC was having financial difficulties with its surety, and those problems were delaying the progress of the work. A cure notice issued by the Navy in December 1990 led to a meeting between the Navy and AEC on January 23, 1991. At that meeting, AEC provided a schedule with a projected completion date of April 16, 1991. The Navy agreed not to terminate the contract for default if AEC continued to make progress according to that schedule. AEC subsequently submitted a revised schedule with April 26, 1991, as the completion date. The Navy accepted that revised schedule, although for reasons that are unclear from the record, the parties subsequently used the following day, April 27, 1991, as the projected completion date for the project.

In late February 1991, AEC's surety froze the project's bank account, and the number of workers doing productive work on the project began to decline. At a meeting on March 5, 1991, the Navy asked why the project was progressing so slowly. AEC advised the Navy that it was unable to make progress on the project because the surety would not release funds from the project's bank account. The Navy re-

sponded by stating that AEC was close to being terminated for default.

On March 20, 1991, the Navy sent AEC a letter containing a cure notice. In the letter, the Navy stated that its agreement at the January 23 meeting not to pursue termination for default was contingent upon AEC's diligently pursuing completion of the contract by April 27, 1991. Since the January 23 meeting, the Navy charged, "work in place continues to progress at a dangerously low pace." Based on the decreasing number of man-hours being devoted to the job, the Navy expressed concern that AEC would not be able to complete the project by April 27. The Navy therefore stated that it considered AEC's "failure to diligently pursue completion a condition that is endangering performance of the contract" and advised that unless that condition was cured within 10 days, the Navy would consider terminating the contract for default.

AEC responded to the cure notice with a letter dated April 3, 1991. In the letter AEC explained that while it had previously appeared possible to complete the project by April 27, 1991, "numerous factors have prevented [the project's] scheduled progress." First, AEC claimed that "the many changes and delays caused by the Government have made an April completion impossible." Second, AEC complained that since January 1991 the surety had interfered with AEC and hampered its progress on the job by blocking the release of funds sufficient to enable AEC to pay its subcontractors and meet other project expenses. The "financial strangulation" by the surety, AEC stated,

> has progressed to the point of not only preventing AEC from meeting its April 27, 1991 completion date, it has made it impossible for AEC to predict an ultimate completion date at this time. As a matter of fact, unless [the surety and its affiliate] restrain [sic] from their present conduct and release the funds currently in [the project's] bank account, it is doubtful that AEC will ever be able to complete the project.

The Navy responded by letter the next day, stating that it could not evaluate AEC's response because AEC's contentions that burdensome changes and government-caused delays had made an April 27 completion impossible were vague and unsubstantiated. The Navy directed AEC to provide a detailed response to substantiate its allegations. The Navy added that the March 20 cure notice required AEC to cure the dangerously slow work pace within 10 days, and it "strongly encourage[d]" AEC to address the cure issue.

On April 5, AEC answered by stating that it "cannot cure the deficiency stated in your Cure Notice due to the restrictions that [the surety and its affiliate] have imposed on the disbursement of funds from the joint escrow account. Consequently we cannot give you any assurance as to when the project will be completed." AEC added that "[t]he financial strain of this action has been aggravated by costs incurred as a result of delays and additional work caused by the government." In response to the Navy's request for substantiation of the allegations regarding government-caused delays and changes, AEC responded that "due to time constraints, we refer you to correspondence which we sent you in preparation for our meeting of January 23, 1991." In a second letter dated the same day, AEC advised the Navy that it had reduced its work force at the job site to two supervisory employees because of the financial restrictions imposed by the surety.

The Navy called a meeting at the site on April 9, 1991, at which it gave AEC an unsigned letter directing AEC to "show cause" why the contract should not be terminated for default. The letter directed AEC to respond within ten days. AEC received a signed copy of the letter on April 11. During the following 10 days, AEC did not respond to the Navy's "show cause" letter, and throughout that period AEC had only a handful of workers on the job site.

On April 22, 1991, the Navy terminated the contract for default. The termination notice stated that the contract was being terminated "due to failure to make progress in the work and for default in performance." AEC responded by letter the same day, expressing surprise that the Navy had terminated the contract without waiting for AEC's response to the show cause letter.

AEC appealed the termination. After the contracting officer denied the appeal, AEC appealed to the Armed Services Board of Contract Appeals, which held the termination invalid. The Board concluded that modifications and delays to AEC's contract performance attributable to the government entitled AEC to an extension of time, which changed the contract completion date to May 16, 1991. The Board further ruled that the Navy had presented "no evidence that AEC could not complete contract performance by the extended contract completion date [May 16, 1991] produced by an appropriate analysis of the time extensions to which AEC is entitled." Accordingly, the Board concluded that "the Navy's default termination for failure to make progress was improper." The Board also rejected the Navy's argument that AEC had breached the contract by anticipatory repudiation. Because AEC had not "expressed an unequivocal unwillingness or inability to perform," the Board concluded that it had not repudiated the contract and that the default termination could not be sustained on that ground. Finally, the Board rejected the Navy's argument that the default termination was justified because AEC failed to give the Navy assurances that it could complete the contract on a timely basis.

The government sought reconsideration. In its reconsideration motion, the government argued, *inter alia*, that the Board had used the wrong legal standard in determining that the Navy was unjustified in terminating the contract because of AEC's failure to make progress. The government argued that the Board had required it to prove that it was impossible for AEC to complete performance in the time remaining. The Board responded that it had not applied that standard, but had applied the standard urged by the government, *i.e.*, whether the Navy had a reasonable basis for concluding that there was no reasonable likelihood the contractor could perform the contract within the time remaining for contract performance. The Board explained that even though it had applied the government's proposed standard, it had found against the government. Because the Navy "had no reasonable basis to conclude that there was no reasonable likelihood that the remaining work could be performed within a required time for performance," *i.e.*, by May 16, 1991, the date the Board determined to be the correct completion date in light of adjustments for government-ordered changes in the contract, the Board reaffirmed its holding that the termination for default was improper.

## II

On appeal, the government renews its contention that the Board applied an erroneous legal standard to evaluate the propriety of the default termination. According to the government, the Board found the termination to be *per se* improper because the Navy (1) failed to anticipate that the Board would award AEC an extension of the contract completion date to May 16, 1991, and (2) failed to present evidence that AEC could not have completed performance by then.

■ We disagree with the government's contention. In its opinion on reconsideration, the Board expressly stated that it had required the government to show that it was reasonable for the Navy to conclude that AEC would be unable to complete the project by what the Board found to be the proper completion date. The government acknowledges that to be the correct standard, *see Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987), but suggests that while the Board articulated that standard, it did not faithfully apply it.

We are not persuaded that the Board mouthed one standard but applied a different one. The Board expressly found that the Navy could not reasonably have concluded that there was no reasonable likelihood that AEC could have completed the contract by May 16, 1991. We therefore reject the government's argument that the Board applied the wrong standard for evaluating the merits of the default termination decision.

We agree with the government, however, with respect to one of the alternative grounds it has raised on appeal. In response to the Navy's March 20, 1991, cure notice, AEC failed to give the Navy adequate assurances that it could complete the contract on a timely basis or even that it could continue to make progress toward completion. That failure, the government argues, justified the Navy's decision to terminate the contract for default. Because we agree with the government on that issue, we reverse the Board's decision and hold that the default termination was valid.

 When the government has reasonable grounds to believe that the contractor may not be able to perform the contract on a timely basis, the government may issue a cure notice as a precursor to a possible termination of the contract for default. *See Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435, 438–39 (1977) (government issued a cure notice when the contractor had done no substantial work during the construction season). When the government justifiably issues a cure notice, the contractor has an obligation to take steps to demonstrate or give assurances that progress is being made toward a timely completion of the contract, or to explain that the reasons for any prospective delay in completion of the contract are not the responsibility of the contractor. *See Tubular Aircraft Prods., Inc. v. United States,* 213 Ct.Cl. 749, 750, 566 F.2d 1190 (1977) ("Plaintiff's minimal performance efforts coupled with its perilous financial situation warranted the issuance of a cure notice. Thereafter, plaintiff's

failure to advise the Government that corrective action would be taken in order to make performance at levels reasonably commensurate with contract requirements financially possible, justified the default termination."); *Composite Laminates, Inc. v. United States,* 27 Fed.Cl. 310, 323–24 (1992) ("When the government issues a cure notice, in order for a contractor to avoid default, a contractor must be able to provide adequate assurances to the government that it can complete contract requirements on time."); *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710, 723 (1986) (once the cure notice was issued to the contractor, "its failure to correct, explain or communicate with [the government] during the period what corrective action that would be taken, justified a termination for default"); *VATEX America,* GPOBCA No. 08–96, 1998 WL 750866 (Oct. 14, 1998); *Twigg Corp.,* NASABCA No. 62–0192, 93–1 B.C.A. (CCH) ¶ 25,318, at 126,157, 1992 WL 184984 (Aug. 5, 1992); *RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 B.C.A. (CCH) ¶ 12,714, at 61,732, 1977 WL 2320 (Aug. 11, 1977).

The law applicable to a contractor's failure to provide assurances of timely completion is a branch of the law of anticipatory repudiation. *See, e.g., Discount Co.,* 554 F.2d at 441 (when the government was not assured of timely completion, the court could properly "rely upon cases involving abandoned or repudiated contracts"). At common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract. *See Dingley v. Oler,* 117 U.S. 490, 503, 6 S.Ct. 850, 29 L.Ed. 984 (1886); *Cascade Pac. Int'l v. United States,* 773 F.2d 287, 293 (Fed.Cir.1985). As the Restatement of Contracts has recognized, however, modern decisions do not limit anticipatory repudiation to cases of express and unequivocal repudiation of a contract. Instead, anticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract. In that setting, the obligee "may

demand adequate assurance of due performance" and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract. *Restatement (Second) of Contracts* § 251 (1981). The Uniform Commercial Code has adopted a similar rule for contracts involving the sale of goods. *See* U.C.C. § 2–609.

■ The law of government contracts has adopted that doctrine, expressing it as a requirement that the contractor give reasonable assurances of performance in response to a validly issued cure notice. *See Tubular Aircraft Prods., Inc. v. United States,* 23 Cont. Cas. Fed. (CCH) ¶ 81,327, at 86,619 (Ct. Cl. Trial Div. Nov. 29, 1976) (recommended decision) (citing the Restatement and stating that "parties are entitled to ask for reassurances when persons with whom they have contracted have by word or deed created uncertainty about their ability or intent to perform and they are entitled to treat the failure to provide such assurances as a repudiation of the contract"), *approved and op. adopted by court, id.* at 86,610, 213 Ct.Cl. 749, 566 F.2d 1190 (1977); *National Union Fire Ins.,* ASBCA No. 34744, 90–1 B.C.A. (CCH) ¶ 22,266, at 111,855, 1989 WL 109758 (Aug. 23, 1989); *Salzburg Enters.,* ASBCA No. 29509, 87–2 B.C.A. (CCH) ¶ 19,761, at 99,994, 1987 WL 40758 (Mar. 30, 1987). That rule, as the Restatement explains, rests "on the principle that the parties to a contract look to actual performance 'and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.'" *Restatement (Second) of Contracts* § 251 cmt. a (quoting U.C.C. § 2–609 cmt. 1).

The Board rejected the government's contention that AEC's failure to give assurances in response to the cure notice justified the default termination. The Board, however, focused solely on the April 9 meeting and concluded that at that meeting the Navy had not asked AEC to give assurances of timely completion. To be sure, the government's briefs before the Board focused mainly on the April 9 meeting, but the briefs did refer to AEC's overall inability or unwillingness to provide assurances of timely completion, including references to AEC's April 3 and April 5 letters to the Navy. We therefore do not limit our analysis of the failure to give assurances to the April 9 meeting.

■ Based on AEC's performance during February and March 1991, the Navy had a reasonable basis for concern that the contract would not be completed by April 27, 1991, the completion date that AEC had projected on February 5 and presented to the Navy to avoid default termination at that time. The Navy was therefore entitled to issue a cure notice demanding a correction of the slow pace of the work or a satisfactory explanation of how AEC planned to complete the work on a timely basis. The issuance of a cure notice was justified under the circumstances, even if the circumstances did not, at that point, justify a termination for default. *See National Union Fire Ins.,* 90–1 B.C.A. (CCH) at 111,855 (noting that the "right to demand assurance need not spring merely from a performance or progress failure, but may be asserted whenever reasonable grounds exist to believe a breach will be committed").

■ AEC's response to the cure notice did not satisfy its obligation to provide assurances to the Navy that it could timely complete the contract. AEC did not dispute the Navy's assertion in its cure notice that at its current pace it would not be able to complete the contract by April 27. In fact, AEC's April 3 letter stated that "the financial strangulation" of AEC by its surety had prevented AEC "from meeting its April 27, 1991 completion date" and had "made it impossible for AEC to predict an ultimate completion date at this time." Moreover, AEC stated that unless the surety and its affiliate released funds in the project's bank account, "it is doubtful that AEC will ever be able to complete the project." When the Navy asked for a more specific response, AEC responded on

April 5 with a letter in which it reiterated that "due to the restrictions that [the surety and its affiliate] have imposed on the disbursement of funds from the joint escrow account ... we cannot give you any assurances as to when the project will be completed." Clearly, the April 3 and April 5 letters offered nothing to allay the Navy's concerns about AEC's ability to complete the contract on a timely basis.

At about the time of the April 3 and April 5 letters, AEC removed the contract files and office equipment from the work site and disconnected the telephone at the work-site office. At the same time, AEC advised the Navy that it had been forced to reduce its work force at the facility to two persons and that it could not "continue to incur costs on this project given the financial restrictions being imposed on us by [the surety and its affiliate]." Finally, at the meeting between representatives of the Navy and AEC on April 9, AEC was given a notice to show cause within 10 days why the contract should not be terminated for default, and AEC failed to respond within the 10–day period.

AEC's conduct, like its responses to the cure notice, clearly failed to provide the requisite assurances that AEC would complete the project on a timely basis. Rather than providing an assurance of timely completion, AEC told the Navy, through both its words and its conduct, that the contract was not likely to be completed until AEC was able to work out its financial difficulties with its surety. AEC offered the Navy no reason to believe that those difficulties would be resolved any time in the near future. Moreover, although AEC makes some effort to suggest that its financial difficulties were the fault of the government, there is no finding by the Board to that effect and no evidence supporting that suggestion. Thus, there is no reason in this case to depart from the normal rule that the contractor's financial difficulties are not a legitimate excuse for its failure to make progress. *See, e.g.,* *TGC Contracting Corp. v. United States,* 736 F.2d 1512, 1515 (Fed.Cir.1984); *Kennedy v. United States,* 164 Ct.Cl. 507, 514 (1964); *Howell Tool & Fabricating, Inc.,* ASBCA No. 47939, 96–1 B.C.A. (CCH) ¶ 28,225, at 140,941 (Feb. 29, 1996); *Transdyne Corp.,* ASBCA No. 12834, 69–1 B.C.A. (CCH) ¶ 7615, at 35,371 (Apr. 2, 1969).

AEC's assertions of government-caused delay similarly did not respond adequately to the Navy's request for assurances. Although AEC referred to government-caused delays in both the April 3 and April 5 letters, it was not specific as to what changes had caused delay or how much delay it considered the government to have caused, nor did it represent that it could complete the contract within the additional time to which it believed it was entitled. In the April 3 letter, AEC simply made a blanket assertion that government changes and delays had been partially responsible for AEC's failure to adhere to the schedule it had agreed to at the January 23 meeting. In its April 5 letter, after being asked for more specificity on that issue, AEC simply referred to material it had provided to the Navy before the January 23 meeting, even though that meeting pre-dated the setting of the April 27 target date for completion of the project. Although AEC conceded that some of the issues referred to in the January 23 material had been resolved, it argued that other issues remained. Of the remaining issues, however, AEC identified only the fire loop around the building as a change that caused additional delay. On that issue, the Board found that the government-caused delay affected AEC's performance primarily in the last half of 1990, even before the January 23 meeting. AEC's responses to the cure notice thus did not adequately explain how its slow progress was the product of delay caused by the government or was otherwise excusable.

Under these circumstances, we conclude as a matter of law that AEC failed to respond adequately to the Navy's reasonable request for assurances of timely performance. The Navy was therefore entitled to regard AEC's failure to provide

such assurances as a breach of the contract justifying termination of the contract for default. On remand, the Board shall address the remaining issues of liability based on our holding that the default termination was valid.

*REVERSED and REMANDED.*