McDONNELL DOUGLAS CORPORA-TION and General Dynamics Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91–1204C.

United States Court of Federal Claims.

Aug. 31, 2001.

---

Caryl A. Potter, III, Elizabeth A. Ferrell, Roger K. Heidenreich, and Allyson B. Handler, Sonnenschein, Nath & Rosenthal, Washington, D.C., and St. Louis, Missouri, for plaintiff McDonnell Douglas Corporation, with whom was John W. Walbran, McDonnell Douglas Corporation, of counsel; Linda L. Listrom, Gregory S. Gallopoulos, and David A. Churchill, Jenner & Block, LLC, Chicago, Illinois and Washington, D.C., for plaintiff General Dynamics.

Bryant G. Snee, Robert E. Kirschman, Jr., Patricia M. McCarthy, Alan J. Lo Re, Eric J. Nestor, and David B. Stinson, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant, with whom were, Stuart E. Schiffer, Acting Assistant Attorney General, and David M. Cohen, Director; George P. Williams, Department of Navy, Washington, D.C., of counsel.

## OPINION

HODGES, Judge.

The issue in this case now is whether the Navy's unilateral modification establishing a new schedule for first flight was reasonable. The schedule was in place at termination, and it was specific. *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319, 1332 (Fed.Cir.1999). If it was reasonable as well, the Circuit's finding that the Government's decision to terminate for default was performance-related will require us to rule for defendant.

The unilateral schedule was reasonable. A Contracting Officer acting with discretion rationally could have determined that the contractors would not have achieved first flight by December 1991. In consideration of these factors, we dismiss plaintiffs' complaint and enter judgment for the Government.

## I. BACKGROUND

The Navy introduced a program in 1984 to develop a carrier-based stealth aircraft known as the A–12. The A–12 was a full-scale engineering and development contract. McDonnell Douglas and General Dynamics contracted with the Navy in 1988 to produce eight A–12 aircraft.[1] The Navy could purchase four production lots of aircraft. It exercised this option in May 1990. Each aircraft would test different characteristics of the A–12. The eighth aircraft would possess the stealth characteristics that would serve as the basis for the optional production lots. The contract schedule called for delivery of the first aircraft in June 1990; the remaining aircraft were to be delivered monthly through January 1991.

Plaintiffs experienced difficulties in performance of this contract from the beginning. Delivery schedules and aircraft weight growth were the primary concerns. The contractors also were aware that their costs likely would exceed the ceiling price in the contract. Everyone knew in early 1990 that a June 1990 first flight could not be achieved. The Contracting Officer asked the contractors for an estimate of when the first aircraft would be delivered. Negotiations ensued, but ultimately the Navy and the contractors could not agree on a date. The Navy issued a unilateral schedule modification on August 17, 1990. The unilateral schedule for first flight was December 31, 1991.

The contractors asked the Navy for restructure of the contract in November 1990. The Navy issued reports during November that the Navy A–12 Program Manager was unreasonable in his conclusion that the contract could be completed within the specified ceiling price, and he failed to anticipate greater risk in the schedule. Secretary of Defense Cheney briefed the President of the United States in early December. He expressed disappointment with the Navy's handling of the A–12 program and promised to take corrective action. Thereafter, Secre-

---

1. For a full factual background see *McDonnell Douglas Corp. v. United States,* 35 Fed.Cl. 358 (1996) (*see also McDonnell Douglas Corp.,* 182 F.3d 1319 (Fed.Cir.1999)).

tary Cheney directed the Deputy Secretary of Defense to report on the status of the A–12 program within 10 days.

Secretary of the Navy Lawrence Garrett responded to Secretary Cheney's request on December 12. Secretary Garrett was concerned about the contractors' willingness to complete the contract as it was then structured. The Office of the Secretary of Defense sent a memorandum to the Navy on December 14, directing the Navy to "show cause by January 4, 1991 why the Department should not terminate the A–12 program and pursue other alternatives."

At the direction of OSD, the Navy sent a cure notice to the contractors on December 17. The Navy asserted in the notice that the contractors "failed to fabricate parts sufficient to permit final assembly in time to meet the schedule for delivery of FSED aircraft [and] fail[ed] to meet specification requirements...."

The contractors responded to the cure notice denying they were in default of the A–12 contract. They asserted that the unilateral schedule was unenforceable and that the specifications were unachievable. The contractors also provided the Navy with a "Proposal for Equitable Restructure of the A–12 Contract." They requested the contract be restructured pursuant to Pub.L. No. 85–804.[2] In return, they would absorb a $1.5 billion fixed loss, the contract would be restructured to a cost-reimbursement contract, and they would waive their claims for equitable adjustment. The record indicates that the UnderSecretary of Defense for Acquisition, Mr. Yockey, would have been willing to go forward if the contractors had agreed to accept a $2 billion loss and other concessions.[3]

Rear Admiral William R. Morris was the Contracting Officer at the time. He met with UnderSecretary Yockey and Navy officials on January 4. The Chief Engineer for the Navy reported at the meeting that technical challenges on the A–12 were typical for this type of development contract, and that the contractors could resolve remaining technical challenges. The Navy and the Joint Requirements Oversight Council re-validated the operational requirements.

Secretary Cheney met with Secretary Garrett, UnderSecretary Yockey, and the Chairman of the Joint Chiefs of Staff on January 5 and decided not to grant 85–804 relief. Secretary Cheney understood that the A–12 program would be cancelled as a result, but the Navy would decide how and whether to terminate the contract. Admiral Morris met with Mr. Yockey and other Department of Defense officials on Sunday, January 6. He terminated the contract for default the next day.

Before then, Admiral Morris did not believe that 85–804 relief was the only way to proceed with the contract. He wanted the opportunity to work with the contractors. Admiral Morris had not anticipated termination of the A–12 contract.

Admiral Morris testified that under Yockey's guidelines he was not able to do what he wanted to do, which was to continue the contract. *McDonnell Douglas Corp.,* 35 Fed. Cl. at 368 n. 13. The termination letter stated that plaintiffs were being terminated for "inability to complete the design, development, fabrication, assembly and test of the A–12 aircraft within the contract schedule and the Team's inability to deliver an aircraft that meets contract requirements." *Id.* at 368. The letter stated,

> the Team is in default of the contract for having failed to make progress and not meeting contract requirements. The A–12 aircraft will not be delivered within the contract schedule nor will it meet the weight guaranty contained within the contract specification.

The contractors sued for relief on a number of bases, and the parties agreed to litigate a potentially dispositive issue first. That was Count 17, which challenged the

---

2. Pub.L. No. 85–804 grants the President of the United States the power to authorize agencies or departments to provide extraordinary relief if doing so would promote national defense. *See* 50 U.S.C. § 1431 (1994). *See also McDonnell Douglas Corp.,* 182 F.3d at 1323.

3. This suggests that Mr. Yockey at least, a major decision-maker on the scene, did not lose confidence in plaintiffs' expertise but was only haggling over price.

manner in which the Navy terminated the contract for default. We ruled that the default termination was improper because we found from testimony and other evidence that Admiral Morris was not permitted to exercise reasoned discretion. *Id.* at 375. We found that the termination for default was not related to performance. *Id.* at 377. The Navy was the contracting agency, and it did not believe that the contractors' performance justified termination for default.

The Federal Circuit found that "the government's default termination was not pretextual or unrelated to Contractors' alleged inability to fulfill their obligations under the contract." *McDonnell Douglas Corp.,* 182 F.3d at 1326. The Circuit's opinion states that "the government's decision to terminate the A–12 FSD Contract for default was related to contract performance ...." *Id.* at 1326–27. It directed us to determine whether the contractors were in default of the A–12 contract. "[I]f the government can establish that Contractors were in default, then the termination for default would be valid. (citation omitted). Conversely, if the government is not able to make this showing, then the default termination was invalid ...." *Id.* at 1329.

We tried this issue for 6 weeks in May and June 2001. The Government argued that it was not limited to the bases for default found in the cure notice. That does not matter because the only reason for default that can be sustained happens to be in the cure notice: schedule. As noted above, plaintiffs would not have met the December 1991 schedule, known as P00046. We find that this schedule was reasonable.

## II. DISCUSSION

### A. Schedule

The default notice issued on January 7, 1991 stated that termination of plaintiffs' contract was based in part on plaintiffs' "inability to complete the design, development, fabrication, assembly and test of the A–12 aircraft within the contract schedule ...." The Federal Circuit stated that Admiral Morris believed the contractors could not meet the delivery schedule, and that he "be-

lieved [the] Contractors to be in material breach of the contract." *McDonnell Douglas Corp.,* 182 F.3d at 1327.

■ The schedule established by the Best and Final Offer provided that the first FSED aircraft was due in June 1990, and the remaining aircraft would be delivered monthly through January 1991. The contractors experienced problems in performance of the contract from its inception, "namely controlling the growth of the aircraft weight and meeting the contract schedule." *McDonnell Douglas Corp.,* 35 Fed.Cl. at 362. The Navy was aware in early 1990 that the contractors would not meet the delivery date for the first aircraft, but it took no action to terminate the contract then. *Id.* "When a due date has passed and the contract has not been terminated for default within a reasonable time, the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance." *DeVito v. United States,* 188 Ct.Cl. 979, 413 F.2d 1147, 1154 (1969). Defendant waived its right to terminate plaintiffs for default based on the delivery schedule set forth in the original agreement. It elected to permit plaintiffs to continue working several months past June 1990 and thereby surrendered its right to terminate for that reason. *Id.* at 1153.

The Navy issued contract modification P00046 unilaterally on August 17, 1990, setting first flight for December 31, 1991. *McDonnell Douglas Corp.,* 35 Fed.Cl. at 362. The Government seeks to uphold the default termination on the ground that the contractors were not making progress toward the December 1991 first flight schedule. Plaintiffs argue that the Navy's unilateral schedule was unreasonable and therefore unenforceable. If so, legally they could not have been terminated on that ground. Alternatively, they argue that the new schedule was waived.

■ The Government may terminate a contractor for default based on failure to make progress toward meeting an enforceable schedule. FAR 49.402–1(a). For a unilateral schedule to be enforceable, the Gov-

ernment must follow certain procedures when establishing the new schedule. *DeVito*, 413 F.2d at 1154. The time for performance must be "both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given." *Id.; see also International Tel. & Tel., etc. v. United States*, 206 Ct.Cl. 37, 509 F.2d 541, 549 (1975). The reasonableness requirement in *DeVito* is based on what the Government "knew or should have known...." *ITT*, 509 F.2d at 550. The burden is on defendant to show that it "reestablished a new delivery schedule reasonable in the circumstances, upon a failure to comply with which it properly based the termination for default." *Jack Spires & Sons Electrical Co. Inc.*, 87–3 B.C.A. (CCH) ¶ 20,-069 at 101,627, 1987 WL 45930 (Aug. 10, 1987).

■ The contractors argue that Captain Elberfeld, the Navy A–12 Program Manager, did not establish a reasonable schedule.[4] According to plaintiffs, the unilateral schedule was intended to serve as a "placeholder" because it did not provide revised dates for flight testing or contract completion. Moreover, plaintiffs contend that the Navy was aware that General Dynamics was having trouble manufacturing composite parts, and that the in-house system that General Dynamics was using for schedule projections was unreliable.

The contractors employed a "P/2" computer system to create an internal manufacturing schedule. Plaintiffs argue that while the P/2 system did set a first flight schedule, the system was not reliable. It did not account for manufacturing problems or unexpected technical issues, for example. Weight reduction efforts and porosity problems resulted in increased complexity in the manufacture of composite structures, according to plaintiffs. They point out that the Navy did not rely on the contractors' schedule. Admiral Cook testified that by June 1990 the Navy had lost confidence in the contractors' ability to predict the schedule.

The contractors contend that even the Navy's first flight projections were slipping to the right, and that the Navy program office was projecting in August 1990 that first flight could occur in February 1992. Commander Shields' PERT system was showing a first flight in February 1992 just three days before the issuance of the unilateral schedule.[5]

"Microcracking" in certain large composite wing parts known as "big ribs" was discovered just days before the issuance of P00046 in August 1990. Plaintiffs complain that Captain Elberfeld knew about the microcracking problem but did not take that into account when he issued the unilateral schedule. The contractors also argue that the unilateral schedule was unreasonable because it required a fully specification-compliant aircraft within 16½ months and required delivery of the Lot I production aircraft before the FSED test aircraft. They contend that Captain Elberfeld did not rely on the best estimates the Navy had to produce the unilateral schedule. The contractors complain that the Navy knew or should have known in August 1990 that first flight of December 31, 1991 was not achievable.

A series of events led to the issuance of P00046. Captain Elberfeld testified that in June 1990 the contractors were projecting first flight to occur between July and September 1991. The Government understood that it was not possible for the contractors to deliver the first FSED aircraft in June 1990. Mr. Lamers, the principal program manager for the McDonnell Douglas and General Dynamics A–12 Team, provided information to Captain Elberfeld in June 1990, estimating first flight in July 1991. Captain Elberfeld testified that the contractors had additional time built into the schedule—a buffer. The contractors presented briefing slides to the Government that were used to provide a schedule status. The contractors' slides stated that they had "frozen aircraft number 1,

---

**4.** We have no evidence that the Contracting Officer took any part in the issuance of P00046, or even had knowledge of it. No one argued that this was an issue, however, so we do not address it here.

**5.** PERT stands for Program Evaluation and Review Technique. Commander Shields was Captain Elberfeld's scheduling expert.

configuration." Captain Elberfeld interpreted this to mean that no further design was needed for aircraft number 1. The slides also indicated that the contractors had factored in contingencies in creating span times. That is, "how long it may take to manufacture a part [and] how many tries it would take...."[6] The contractors added time to cover the unknowns. The Government considered the contractors' P/2 system to be a tool that was working effectively to estimate the schedule, according to Captain Elberfeld.

The Government made a reasoned assessment to determine whether the contractors could achieve first flight in July 1991. The Navy reviewed the contractors' estimates and added an additional 25 percent for slippage. The Government predicted first flight to occur in November or December. 1991. Shortly thereafter, Captain Elberfeld attended a meeting with Secretary Cann. Secretary Cann instructed Captain Elberfeld to get a handle on the schedule. Projected first flight kept slipping to the right and Secretary Cann wanted to know when the contractors would be ready for first flight. Secretary Cann instructed Captain Elberfeld to set a "schedule with sufficient slack."[7] Captain Elberfeld testified that he interpreted Secretary Cann's words to mean

> don't go out and try to be a big hero and have a schedule to get somewhere that is not achievable. Make sure you build in the type of contingency and buffer time that's necessary to ensure that in going forward in a restructuring we've allocated enough time that we don't need to go back and restructure and reschedule again. Give yourself the room in this first restructuring, one bite at the apple more or less.

The Navy wanted a reasonable schedule, not an unachievable one. The contractors and the Navy convened a strategy board to put together a realistic schedule for first flight. Captain Elberfeld testified that while the Navy could not achieve a "signed-up commit-

ment" from the contractors, he felt that they were "moving in the right direction." At the meeting, the contractors agreed to work toward an aggressive plan but they would not sign up to a schedule. Captain Elberfeld felt that most of the technical issues affecting first flight were under control. He developed a delivery schedule for first flight that "was meant to be ... realistic [and] achievable." He stated, "with all the information we had at the time, it was an achievable schedule."

Captain Elberfeld felt that setting a unilateral schedule was the appropriate approach because

> If you don't have a delivery schedule that's realistic, you're just sort of drifting and any schedule that—any type of an interim schedule that you're planning to use along the line doesn't have any of the weight of contractual force behind it. It ends up being sort of a rubber or elastic schedule and can just move to fit the events that are taking place. Instead of trying to manage the program, you end up being run by events instead of proactively managing them.

Captain Elberfeld wanted a schedule that both the contractors and the Navy felt was one they could use to manage the program. During this period, the contractors were proposing July—September 1991 for first flight.

John Lamers, plaintiffs' A–12 Program Manager, spoke with Captain Elberfeld on August 14 about problems with microcracking. Mr. Lamers told Captain Elberfeld that it could be a tooling or cure. cycle problem and that the contractors were in the process of finding a solution. Captain Elberfeld testified that Mr. Lamers did not seem concerned and the microcracking was just one among several items he mentioned. Captain Elberfeld considered this problem but decided not to change his mind about setting the unilateral schedule for first flight for December 1991. He felt that the contractors had

---

**6.** Captain Elberfeld testified that span times are used in determining the overall flow of manufacturing in the factory. They are the "amount of time it takes to perform a particular task."

**7.** The decision to issue a unilateral schedule modification did not originate with the Contract-

ing Officer or even with Captain Elberfeld. Neither was it the idea of his boss, Secretary Cann. Very likely the direction came from Mr. Yockey, the Acting Assistant Secretary of Defense for Acquisition.

identified the problem and were working to fix it. He knew that contingencies and conservatism were built into the unilateral schedule, and he made a reasoned decision not to adjust the December deadline. He felt that the buffer was adequate to address the problems that the contractors were experiencing. At this time, the contractors were predicting first flight to occur *before* December 1991. Mr. Lamers testified that the contractors were "showing somewhere between September and November 1991" for first flight at the Design Review Board in September 1990.

It is likely that the December 1991 date was first mentioned by Commander Shields, Captain Elberfeld's scheduling expert. In any event, Captain Elberfeld consulted with Commander Shields before he issued P00046. Commander Shields was the Production Readiness Officer on Captain Elberfeld's team. One of Commander Shields' responsibilities was to develop schedule estimates for the Navy. He provided Captain Elberfeld information needed to update the schedule. Information was derived from different people within the Navy, as well as input from the contractors. Captain Elberfeld attended a meeting with Commander Shields and others on August 14. Commander Shields reported an inner wing problem that could lead to a February 1992 first flight if nothing were done to correct it. He also reported that a five-day work week would lead to an April first flight. The contractors were working six days a week at the time, however, and in Captain Elberfeld's words, there "may have been some coverage in the overall plan for [the inner wing issues] . . . already." The Navy started with the information given to them by the contractors to predict a reasonable first flight date. The Navy looked at the contractors' past history, evidence of progress on the contract, estimates of delivery dates on tooling, estimates on composite part fabrication, and the "number of parts off a tool" to create a government estimate of first flight.[8]

It is important to note that once given his orders to develop a unilateral first flight schedule, Captain Elberfeld went about his mission in a thorough and comprehensive manner. He did not merely accept Mr. Lamers' optimistic projections on behalf of the contractors. He investigated the computer software that plaintiffs were using to estimate schedules in house. Mr. Lamers provided an explanation of his July 1991 first flight estimates by category. He noted that the Contractors were including one month for "contingency" and three months for "conservatism."

The original contract terms required the contractors to begin delivery of the Lot 1 aircraft in June 1991. P00046 did not change the Lot 1 delivery schedule. This meant that delivery of the first production aircraft was required before delivery of the first test aircraft. Captain Elberfeld testified that the unilateral schedule did not establish a schedule for contract completion. Captain Elberfeld conceded that it made no sense and was not intended. The Government did not expect the Lot 1 aircraft to be delivered prior to the FSED aircraft. P00046 was intended to set the schedule for first flight, not completion of the contract.

The unilateral schedule was reasonable. Captain Elberfeld relied on input from Commander Shields as well as overall test plans made by his flight test deputy, Colonel Nyalko. Plaintiffs argued at trial that Captain Elberfeld did not consider Commander Shields' first flight estimates. However, Captain Elberfeld knew of Commander Shields' estimates. He knew that the dates were flexible; they could slip to the right or to the left. Commander Shields' dates were based on the assumption that nothing would be done about the problems. Commander Shields made hundreds of projected first flight estimates, all dependent on different assumptions. His job was to be pessimistic.[9] But Captain Elberfeld obtained information from the contractors as well. The Navy wanted to set a schedule that the contractors could meet. Captain Elberfeld set a sched-

---

8. "Number of parts off a tool" refers to the number of times it takes a contractor to manufacture a good part.

9. Plaintiffs did not call Commander Shields as a witness at trial.

ule that took into account the critical information that he had at the time.[10]

The contractors concede that they were not going to make the December 1991 first flight. Default may be sustained on this ground.

### B. Schedule Waiver

■ Plaintiffs contend that even if the unilateral schedule was reasonable, it was waived. This is important because we have found that the schedule was reasonable and that plaintiffs would not have met it. According to plaintiffs, the Navy knew that the contractors were targeting a March 1992 first flight date. Plaintiffs point to a presentation by Captain Elberfeld and Captain Currie at the Tailhook Convention in September 1990, where they announced that first flight would occur in the first quarter of 1992. Moreover, in preparation for a meeting of the Defense Acquisition Board, Captain Elberfeld told the contractors to assume a March 1992 first flight date. According to the contractors, that is the date the Navy expected first flight; not December 1991. The contractors briefed the March 1992 first flight to the Navy and to officials in the OSD office in November 1990. The contractors told the Conventional Systems Committee in late November 1990 that a March 1992 first flight was projected. The contractors assert that they heard no objection to the March date, and relied on statements made during the Tailhook Convention and those of Captain Elberfeld. They continued to perform the contract with the March 1992 date in mind. Plaintiffs quote Admiral Johnson as stating that the Navy would have accepted a June or even a September first flight.[11] These communications establish that P00046 was waived, according to plaintiffs.

Captain Elberfeld testified that he briefed the Tailhook Convention on a first flight date of September 1992 "because of the security nature of the program, and ... [to] not put in something overly optimistic ... and making sure that [the aviators] wouldn't be disappointed [if first flight weren't achieved]." His statements were not intended to be a waiver of the December 1991 first flight date. He testified that a March 1992 first flight was "acceptable for a planning date, in going forward to the Defense Acquisition Board, for the purpose of baseline—rebaselining the program." It is true that Captain Elberfeld told the contractors to assume a March 1992 first flight in preparation for a meeting of the Defense Acquisition Board. However, the parties were negotiating a restructured program at the time, and that assumption was contingent upon a restructured program. In any event, a key element of waiver is reliance. We saw no evidence that the contractors relied on a March flight deadline to their detriment. They were obligated by contract to perform regardless of the schedule.

### C. Financial Ability

■ Defendant argued in its opening statement that the only possible way to save the A–12 program was to place additional funds into the program or into the contract. There were only two sources from which the money could have come, the Government or the contractors. The Government chose not to put additional funds into the contract, and the contractors did not have the money, according to defendant. It is defendant's position that the contractors were legally obligated to complete the contract, but "didn't have the funds to do so."

10. Mr. Anderson, a contractor executive, acknowledged that reasonable minds could disagree on a reasonable schedule in these circumstances.

11. This statement is true. The Navy would have accepted dates well beyond the March 1992 projection. Admiral Johnson was a highly credible witness and we agree that the Navy would have been satisfied with a September 1992 first flight. In fact, we have no doubt that *the Navy* was satisfied with the entire program, if somewhat frustrated with the contractors' pace. But the Circuit makes the point that *the Government* does

not relinquish its right to terminate a contract merely because in this case the Navy wanted the plane. We agree. The Navy's desire to continue the contract was meant to be support for our finding that Admiral Morris was not permitted to exercise discretion in deciding whether to terminate the contract and to terminate it for *default.* Termination for default is a very serious sanction that rarely is applied by the Government. These were corporations that have a history of participation in successful and highly sensitive weapons development projects with the United States.

■ The Federal Circuit expressed its view that "[t]he cost to complete a contract—more particularly, the inability of a contractor to perform a contract at the specified contract price—and the ability to meet a contract schedule are both fundamental elements of government contracts and are related to contract performance; as such, they are highly relevant to the question of default," *McDonnell Douglas Corp.*, 182 F.3d at 1328. When terminating a contract for default the Contracting Officer is required to "give the contractor written notice specifying the failure and providing a period of 10 days ... in which to cure the failure." FAR 49.402–3. Case law has broadened the scope of this standard. The cure notice "need not cite each and every failure, but it must list with enough particularity the performance failures which have placed the contractor in danger of termination for default." *Composite Laminates, Inc. v. United States*, 27 Fed. Cl. 310, 318 (1992) (quoting *International Verbatim Reporters, Inc. v. United States*, 9 Cl.Ct. 710, 721 (1986)). "Where the plaintiff has received prior notice of its failures, whether by telephone, letter, or word of mouth, that information will be considered properly in conjunction with the cure notice." *Id.*

> The termination letter issued by the Navy on January 7, 1991 states that it was terminating for default because of the Team's inability to complete the design, development, fabrication, assembly and test of the A–12 aircraft within the contract schedule and the Team's inability to deliver an aircraft that meets contract requirements.... [T]he Team is in default of the contract for having failed to make progress and not meeting contract requirements. The A–12 aircraft will not be delivered within the contract schedule nor will it meet the weight guaranty contained within the contract specification.

Neither the cure notice nor the default notice suggests that the Navy thought the contractors were financially unable to complete the contract.[12] Admiral Morris did not consider plaintiffs' financial condition when deciding to terminate the contract for default. Admiral Morris testified that he "was not in a position on the basis of the information [he had] to judge the seriousness of the financial situation of either firm...." He believed that problems could be solved "within the four corners of the contract."

At trial, the Government focused its attention on McDonnell Douglas' alleged financial inability. McDonnell Douglas' financial capacity did not endanger performance on the A–12 contract, however. The Government was provided periodic reports by the Defense Contract Audit Agency (DCAA). The DCAA was charged with auditing contractors' financial status to determine whether adverse financial conditions existed that could jeopardize contract performance. The DCAA concluded in September 1990 that "MDC financial capability is weak when compared to industry standards. However, we do not believe that contract performance is endangered." The DCAA audited McDonnell Douglas again in November 1990 and made the same finding that performance was not endangered. The final DCAA audit occurred in December 1990 with the same result. Contract performance was not endangered.

The Government called Mr. Neuman, a senior price analyst who was the person primarily responsible for assessing the financial condition of McDonnell Douglas during the contract period. He testified that McDonnell Douglas' cash flow situation was "almost a financial crisis...." However, Mr. Neuman conceded that he did not speak to Admiral Morris about the financial condition of McDonnell Douglas prior to termination of the A–12 contract. In fact, his office was not even consulted before the termination occurred. He was not involved in the issuance of the cure notice. He admitted that McDonnell Douglas was a viable corporate entity and at all times its available financing exceeded the amount of debt that it needed to perform its obligations. McDonnell Douglas took a number of steps to conserve cash. It participated in an inventory reduction pro-

---

**12.** We held to the contrary, in fact. "The Contracting Officer did not believe that the contractors would not perform; he wanted to continue the contract and address the issues without extraordinary relief."

gram, curtailed capital expenditures, reduced data processing costs, cut shareholder dividends, and sold real estate. Mr. Neuman testified that none of McDonnell Douglas' government contracts were affected by its financial condition.

The Government presented evidence only with respect to McDonnell Douglas' financial position. It did not determine whether General Dynamics had the financial ability to complete the contract. Eleanor Spector, Deputy Assistant Secretary of Defense for procurement, testified that her "general feeling" was that the contract could not continue without relief under Public Law 85–804. But she conceded that in determining financial ability one must consider both contractors because the A–12 contract made them jointly and severally liable. The Government did not perform this analysis. Ms. Spector testified that she did not have enough data before termination to determine how much cash McDonnell Douglas would have needed to continue performance. She was not aware of the borrowing capabilities of either corporation prior to termination. She did not speak to Admiral Morris about terminating the contract for default. Ms. Spector's office did not assess whether McDonnell Douglas' financial condition was contributing to a failure to make progress on the A–12 contract. Ms. Spector stated that the reasons for the default termination were Admiral Morris' and the reasons that the program would not continue "was wrapped up in a lot of other things."

Evidence at trial established that plaintiffs' financial ability was not a concern of Admiral Morris. He did not terminate this contract for financial inability of the contractors because as he testified, he was not in a position to judge their financial wherewithal. Moreover, plaintiffs' financial condition was not endangering performance of the A–12 contract. Plaintiffs' default termination may not be sustained on this ground.

### D. Repudiation

 The Government contends that the default termination was proper because of the contractors' "failure to provide adequate assurances that [they had] the financial capability to perform the contract constitutes re-

pudiation of the contract." We ruled in April 1996 that the contractors did not repudiate the A–12 contract. *McDonnell Douglas Corp.*, 35 Fed.Cl. at 377. We stated that a contracting officer may terminate a contract for default when the contractor has expressed a "positive, definite, unconditional, and unequivocal manifestation of intent ... not to render the promised performance when the time fixed ... by the contract shall arrive...." *Id.* (quoting *Cascade Pac. Int'l v. United States,* 773 F.2d 287, 293 (Fed.Cir. 1985)) (quoted in *United States v. Dekonty Corp.,* 922 F.2d 826, 828 (Fed.Cir.1991)). The contractors did not fail to provide adequate assurances. The Government did not view the contractors' actions in this manner. *Id.* Admiral Morris did not believe that the contractors would not perform. He wanted the opportunity to work out the problems "within the four corners of the contract."

Defendant argued in its post-trial brief that since our ruling in April 1996, "the Federal Circuit has clarified its adoption of the modern view that, in addition to traditional forms of repudiation ... a contractor's failure to provide adequate assurances that it has the financial capability to perform the contract constitutes repudiation of the contract." The Government quotes the contractors as stating that they "can't get there if we don't change the contract ... [i]t has got to get reformed to a cost type contract or we cannot do it." The contractors stated that they "could not absorb the loss that would result from the contract." Defendant argues that these statements coupled with the contractors' conduct, prove that they would not have been able to complete the contract.

Defendant cites *Danzig v. AEC Corp.,* 224 F.3d 1333 (Fed.Cir.2000) for the modern rule on repudiation. In *Danzig,* the Navy awarded a contract to AEC to complete construction of a Naval and Marine Corps Reserve Training Center. AEC fell behind and the Navy issued a cure notice. At a subsequent meeting with the contractors, AEC proposed a completion date of April 16, 1991. The Navy agreed not to terminate the contract for default if AEC continued to make progress toward that schedule. AEC submitted another revised schedule of April 26, 1991.

Navy accepted this schedule. The project continued to progress slowly and AEC informed the Navy that it was unable to make progress because its surety had frozen its bank account. The Navy issued a cure notice stating that AEC needed to complete the work by the agreed schedule. AEC responded by explaining that the work would not be complete by the April deadline. Due to financial constraints with its surety AEC could not predict when the project would be completed. Unless the surety released funds, AEC stated that "it is doubtful that AEC will ever be able to complete the project." The Navy responded by asking AEC to provide another detailed response. AEC again stated that it "cannot cure the deficiency ... we cannot give you any assurance as to when the project will be completed." The Navy issued a show cause letter to AEC asking why the contract should not be terminated for default. AEC never responded to this request, and on April 22, 1991 the contract was terminated for default.

The Federal Circuit reasoned that the termination for default was proper because AEC "failed to give the Navy adequate assurances that it could complete the contract on a timely basis or even that it could continue to make progress toward completion." *Danzig*, 224 F.3d at 1337. The Federal Circuit noted that AEC "removed the contract files and office equipment from the work site and disconnected the telephone at the work-site office." *Id.* at 1339. AEC's conduct, coupled with its responses did not provide the Navy with assurance that the project would be completed. While AEC asserted that the Government was at fault for some delay, it did not explain why this caused slow progress. *Id.* For all these reasons, the Federal Circuit concluded that AEC had breached the contract.

None of those facts is present here. In response to the cure notice issued by the Navy, the contractors stated that they were committed to the program and were providing a response to the concerns raised by Admiral Morris. The contractors addressed Admiral Morris' cure letter and provided additional information about the progress of the program. Certain specifications and delivery

schedules would not be met, but the contractors explained why this was so. They alleged that certain requirements were impossible to satisfy, for example. Unlike AEC, McDonnell Douglas and General Dynamics continued to perform until they were terminated for default. They were spending between $120 and $150 million per month on the A–12 contract.

Ms. Spector testified that the contractors never refused to perform. The contractors spent money other than that provided by the Government through progress payments. Admiral Morris testified that McDonnell Douglas wanted to solve the problems within the contract. He believed that it was possible to work with the contractors to find a solution. "The contracting officer did not believe that the contractors would not perform; he wanted to continue the contract and address the issues with the contractors without extraordinary relief." *McDonnell Douglas Corp.*, 35 Fed.Cl. at 377. Admiral Morris did not view the contractors' response to the cure notice as failing to provide adequate assurances.

The Government points to the contractors' request for equitable restructure of the A–12 contract as evidence that their financial situation would not permit the contractors to complete this contract. The proposal for restructure was not a response to the cure notice. It was a request for financial assistance. It was not included with the cure notice response but was a separate document with a separate cover sheet. Admiral Morris took notes at a January 2, 1991 meeting with the contractors. He records Mr. Anders, Chairman–Elect of General Dynamics, as stating, "[b]oth companies committed." Yockey agreed that contractors were "mov[ing] in the right direction."

Failure to give adequate assurances does not appear in the termination notice as a ground for default. While the contractors wanted a restructured program they did not state they would suspend work on the A–12 contract. John McDonnell, CEO of McDonnell Douglas, testified that the contractors "weren't about to abandon [the A–12 contract]." Admiral Morris testified that he "would not have terminated the contract on

the 7th of January if I got the authority to give it one more try."

Plaintiffs did not repudiate this contract. Admiral Morris did not terminate the A–12 contract because the contractors did not give adequate assurances. Default may not be sustained on this ground.

### E. Weight

The termination notice includes the assertion that the contractors' inability to meet the weight guaranty was a reason for default. The original weight specification was waived by the Navy. We ruled that 7930 pounds over BAFO was acceptable to the Government. *McDonnell Douglas*, 35 Fed.Cl. at 362 If the parties argued this holding on appeal, the Circuit did not address it.

 Waiver requires that (1) the Government has knowledge of performance that does not conform with contract requirements; (2) the Government through action or inaction indicates that the nonconforming performance is acceptable; and (3) the contractor relies on the acceptance and continues to perform the contract. *Gresham & Co., Inc. v. United States*, 200 Ct.Cl. 97, 470 F.2d 542, 553–55 (1972); *DeVito*, 413 F.2d at 1153–54.

 Defendant accepted the overweight condition of the aircraft. *McDonnell Douglas*, 35 Fed.Cl. at 373.[13] The Navy knew in September 1989 that the contractors would not meet the BAFO weight requirement. *Id.* The Navy encouraged the contractors in October 1989 to "stop worrying about weight and to focus on manufacture and assembly" of the aircraft. *Id.* In May 1990, the Navy determined that the A–12 aircraft weight would be 7930 pounds over BAFO. *Id.* The Navy knew that the original predicted weight was unachievable. *Id.* The Contractors notified the Navy in a June 1990 letter that the BAFO estimate would not be met, and asked that the contract be revised. *Id.* We held that the letter "documents the contractors' belief that the BAFO weight had been waived." *Id.* The Navy was only concerned that it receive an aircraft that met its operational needs. *Id.*

The Navy knew that the weight of the aircraft was 7930 pounds over BAFO. The contractors continued to perform. The weight specification in the contract was waived.

### F. Other Specifications

The Government asserted at trial that the contractors were in default of specifications not identified in the cure notice or the default notice. This includes PA Roll, the Propulsion System, and Structural Certification. The propulsion system includes three components: the air inlet, the engine, and the exhaust nozzle. PA Roll is power approach roll, which refers to the aircraft's ability to roll its wings as it approaches a carrier for landing. The Government also refers to "substantial and continuous" delay by the contractors, which they assert was present throughout the life of the A–12 contract. The Government contends that these alleged problems endangered successful completion of the A–12 contract.

The default notice states vaguely that the contractors' "inability to deliver an aircraft that meets contract requirements" is a basis for default. Admiral Morris did not terminate this contract for the contractors' inability to meet the PA Roll, the Propulsion System, or Structural Certification. He did not even consult with technical personnel before termination. *McDonnell Douglas Corp.*, 35 Fed.Cl. at 368.

More importantly, plaintiffs were not in default of these specifications. The contractors' Chief Engineer, Dr. Keith Jackson testified that PA Roll met the original contract specification. Dr. Jackson briefed Admiral Gentz on the risk reduction efforts that the contractors had taken with respect to PA Roll. These efforts had the potential to improve the A–12's roll performance beyond that required in the contract specifications. General Dynamics' project pilot for the A–12 program, Mr. Sweeney, believed that PA Roll performance was within the specification. He believed that the A–12 PA Roll performance would be carrier suitable.

The Contractors were making progress with respect to the A–12 propulsion system.

13. *See McDonnell Douglas*, 35 Fed.Cl. at 373, for a complete set of factual findings.

Mr. Squires, the Government's A–12 Project Engineer on the propulsion system, testified that he was unaware of termination concerns with respect to propulsion issues. He testified that "[termination] caught [him] totally by surprise." The Navy was aware that in sub-freezing conditions ice could break off from the aircraft inlet and strike the engine. The contractors were not required to perfect anti-icing until aircraft 11. The FSED aircraft that was scheduled to fly in December 1991 did not require the anti-icing procedures. Admiral Cook agreed that the contractors had successfully completed the Critical Design Review in 1989 on the engine. Technical risks associated with the engine were regarded as low at termination. The contractors were solving problems with the engine mixer. Admiral Cook reported to UnderSecretary Yockey that resolution of the mixer problem was a "low-tech fix." The contractors were making progress on the development and testing of the exhaust nozzle. The contractors were performing tests on the nozzle and additional testing was planned. The contractors' problem with nozzle development was not a "showstopper."

The Government contends that structural certification of the A–12 aircraft was another requirement that the Contractors were not meeting at termination.[14] However, Admiral Lockard sent a memorandum to Admiral Gentz in November 1990 reporting that "the A–12 structural certification plan has been agreed to by [the Navy] and the contractors...." Admiral Cook's briefing to Secretary Yockey just before termination rated the overall structure status as "low/medium risk." The contractors had a plan in place and they were making progress with regard to structural certification.

The Government cites 63 other specifications that the contractors were failing to meet at the time of termination. The contractors identified the 63 specifications in July 1990, and the Navy elected to go forward with the contract. The Navy did not terminate the contract then. At Critical Design Review III (CDR III) on October 18, 1990, Admiral Lockard announced that the parties had "reached a technical resolution on the airplane." Admiral Lockard believed that the path to successful close out of CDR III was in place and "if both parties agreed to follow the path ... we would ... wind up concluding CDR with successful results." [15] Soon after termination of the A–12 contract for default, Admiral Cook responded to a draft report of the Inspector General of the Department of Defense as follows:

> [W]hile there were a number of technical concerns identified during the third phase of the CDR ... none were viewed as insurmountable. In fact, in the ensuing months (July to November) all issues were resolved to the satisfaction of the Navy's technical community.

We ruled that "the Navy believed that the aircraft would meet operational requirements." *McDonnell Douglas Corp.*, 35 Fed. Cl. at 371. The contractors were not terminated for failure to meet these 63 requirements. The technical issues were resolved to the satisfaction of the Navy. Default may not be sustained on this ground.

### III. CONTRACTORS' DEFENSES

#### A. Superior Knowledge

We ruled in December 1996 that certain issues related to plaintiffs' superior knowledge defense could not be tried because the resulting threat to national security would not permit it. This determination was based in part on the Government's invocation of the state secrets doctrine and partly on "a series of security breaches and discovery abuses...." *McDonnell Douglas Corp.*, 182 F.3d at 1329. The Federal Circuit asked us to reconsider that Order, but the circumstances that prompted the ruling persist. Therefore, we must reaffirm the December 13, 1996 Opinion and Order for the reasons states therein.

---

**14.** Structural certification is the process of confirming that an aircraft is capable of withstanding loads and stresses during aircraft operation.

**15.** The Government contends that because the minutes of CDR III were not signed it was never closed out. Irrespective of closeout, the contractors were expected to build the aircraft as defined during the CDR process. They did that.

The Federal Circuit's opinion speculated that some of the restrictions on superior knowledge issues would be removed by now, "[b]ecause of the passage of time and of possible intervening developments . . . ." *Id.* at 1330. The Circuit questioned "whether the risk of disclosure of state secrets will preclude adjudication, on remand, of Contractors' superior knowledge claim, and the issues of loss adjustment and reasonable profit." *Id.* But after that, the parties conducted discovery and exchanged contention interrogatories in preparation for trial. In the course of that discovery, plaintiffs issued several interrogatories that prompted the United States to invoke again the military and state secrets doctrines to protect information that is necessary to resolution of these issues.

We reviewed the declaration by Secretary of the Air Force F. Whitten Peters, and determined that it comports with the legal requirements for invoking the state secrets doctrine as set forth by the Federal Circuit. We also reviewed the classified version of Secretary Peters' declaration, and we remain satisfied that superior knowledge issues in this case cannot be litigated safely. This determination is based on that declaration and the warnings described, as well as those of previous government officials.[16] We know from recent briefings that all of these warnings continue to apply with full force.

We cannot establish that the information that has been removed from this case would have benefitted either party. Without extensive discovery related to this information, which will not be permitted for years if ever, no one can know whether either party would have been helped or harmed by it. At one time plaintiffs made a persuasive showing that they could prove their claim without the information. Years later, defendant made the same argument, that it did not need the protected information to defend the superior

knowledge count of plaintiffs' complaint. Neither side was entirely right or entirely wrong. We can never know enough to make a finding of fact on this issue. That is why we could not try claims or defenses that depend on information that has been removed from this case.

Other reasons for removing the superior knowledge issues from this case are set out in *McDonnell Douglas v. United States,* 37 Fed.Cl. 270 (1996). All of those reasons apply today. The Appendix to which we referred in earlier orders and opinions remains classified under seal at the Pentagon. The reviewing court may wish to retrieve that document should it have the occasion to reach this issue again. However, the parties do not have access to this document and it is not included in the record otherwise.

Issues involving superior knowledge cannot be litigated safely. Defendant's argument that it is entitled to a loss adjustment pursuant to FAR 49.203 and plaintiffs' lost profits argument are moot. Plaintiffs may not use superior knowledge as a defense because we cannot know whether that argument has merit.

### B. Impossibility

Plaintiffs now argue that the Government's invocation of the state secrets doctrine has prevented litigation of their impossibility defense. Information withheld by the Government "bore directly on the achievability of the weight, other technical performance, and schedule provisions of the A–12 Contract . . ." according to plaintiffs, and they cannot prove impossibility because superior knowledge is an element of that defense. However, neither this new argument nor the cases cited by plaintiffs fit the facts of this case.

Plaintiffs argue that the court's ruling that the BAFO weight was "unachievable" provides additional evidence that the contract

---

**16.** *See also* McPeak Declaration at 2–3 (July 22, 1993) ("I have concluded that continued inquiry into what is known as plaintiffs' 'superior knowledge' claims would necessarily require examination and use of information that cannot be disclosed in this litigation."); *see also* Donley Declaration at 5–6 (March 30, 1993) ("[i]nadvertent, unauthorized disclosure of the information that is described in more detail in my *in camera*

declaration could severely jeopardize national security."); *see also* Rice Declaration at 4–5 (November 20, 1992) ("The unauthorized disclosure of the national security information at issue reasonably could be expected to cause extremely grave damage to the national security . . . . this will weaken our country's ability to defend itself and could place at risk our aircraft and the lives of the crews of those aircraft.")

was impossible to perform. Yet we did not rule that the BAFO weight was unachievable. *The Navy* thought the BAFO weight was not achievable. So did everyone else. In any event, the BAFO weight is not an issue because we have ruled that it was waived as a contract specification. Similarly, other specifications are not in issue because failure to meet specifications was not a reason that would have supported the contracting officer's decision to terminate for default.

Plaintiffs' best argument is "commercial impossibility" as explained by the Court of Claims in *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. 533, 513 F.2d 588 (1975). A contract is commercially impossible if it "could not be accomplished without commercially unacceptable costs and time input far beyond that contemplated in the contract." Defendant's argument that plaintiffs were approaching the ceiling price of their contract would offer support to such a theory. That is not the argument before this court, however, and no evidence was submitted to support it.

The potential issue of an impossibility defense arose in a pre-trial hearing. Defendant was concerned that evidence of impossibility could be presented after defendant rested its case. We ruled that if plaintiffs were to raise a defense of impossibility, defendant could put on a rebuttal case to address that evidence.[17] Plaintiffs did not present such evidence. In fact, plaintiffs' position has been that building the A-12 was not impossible; it would have flown in March 1992.[18]

### V. CONCLUSION

The United States asked two major defense contractors with impeccable credentials and long histories of government service to undertake a complex and highly sensitive research and development project involving stealth technology. It worked closely with those contractors on a daily basis, on all aspects of the design and manufacture. It worked through the Navy because the Navy was the contracting agency. For reasons that do not appear in the record of this case in their entirety, the Government abruptly terminated the contractors for default.

Admiral Morris, the Navy contracting officer did not want to terminate the contract between the Navy and contractors. He wanted to work out all the problems within the four corners of the contract, as he put it. He was not allowed that option. We found that Admiral Morris had no choice but to terminate the contract. He also felt that he had to terminate for default—a grievous sanction. The Federal Circuit ruled that Admiral Morris terminated the contract for performance-related reasons, and that his actions were products of his independent discretion. That being the law of the case, we must rule for defendant. This is so because the unilateral schedule was reasonable, and if the Contracting Officer was concerned about whether the contractors would meet the schedule, that concern is a legitimate basis for terminating the contract for default.

The Clerk will enter judgment for defendant. No costs.

---

**17.** Plaintiffs' counsel stated that the Government should put on the default case, and "if we put [the impossibility defense] in ... he can come back and defend. If ... we don't come forward with impossibility, he's got nothing to defend against."

**18.** We stated at trial that "plaintiffs' position seems to be that not only was it possible, but you were well on your way to building this ship."