**Bill FRAZIER and Kathy Frazier, d/b/a Yacht Basin Marina, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 04–1481C.

United States Court of Federal Claims.

July 28, 2005.

---

Dale E. Reagor, Luxan & Murfitt, PLLP, Helena, Montana, for plaintiff.

Marla T. Conneely, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director, all of Washington, D.C., for defendant. Loretta V. Chandler, Department of the Interior, Billings, Montana, of Counsel.

## OPINION AND ORDER

WOLSKI, Judge.

The plaintiffs, Bill and Kathy Frazier d/b/a Yacht Basin Marina, entered into a concessions lease with the Department of the Interior, Bureau of Reclamation ("Bureau") for the operation of a marina at the Yacht Basin Marina Concession Area of the Canyon Ferry Reservoir located near Helena, Montana. The Fraziers filed a Complaint in this Court [1] alleging, *inter alia,* that the defendant United States ("Government") breached the lease causing them to lose profits. The Govern-

---

1. The case was originally filed in the United States District Court for the District of Montana. It was transferred to this Court pursuant to 28 U.S.C. § 1631. The plaintiffs filed an amended complaint in this Court on October 19, 2004.

ment has moved to dismiss the plaintiffs' Complaint under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") for failure to state a claim upon which relief can be granted or, in the alternative, under RCFC 56 for summary judgment. For the following reasons, the Government's motion to dismiss for failure to state a claim is GRANTED.

## I. BACKGROUND

On April 25, 1995, the Fraziers entered into a lease with the Bureau for the operation of the Yacht Basin Concession Area ("Concession Area"). Compl. ¶ 4.[2] The lease was to expire on December 31, 2004. Compl. ¶ 11; Compl. Ex. A at 5. On March 21, 2005, the Fraziers and the Bureau entered into a new concession contract for the operation of the Concession Area. Pls.' Opp. at 2. The March 21, 2005 lease between the plaintiffs and the Bureau mooted all of the plaintiffs' claims except their claim for lost profits between October of 2000 and December of 2004. *Id.*; Def.'s Reply at 1–2.

By the terms of the plaintiffs' original lease, the plaintiffs agreed to provide "concession-related recreation facilities and services to the public at the Yacht Basin Concession Area," such as gasoline sales, basic grocery sales, fishing supplies and licenses, tourist information, and boat launching and docking facilities, including boat slips. Compl. Ex. A at 1, 4–5. These facilities and services were to be made available from May 1 to September 30 annually. Compl. Ex. A at 4. The lease provided that "[u]pon expiration of the lease term, the lease may be reissued (renewed) to the existing Concessioners for an additional 10 years, but only after [the Bureau] has utilized a competitive bid process to solicit and evaluate alternative proposals for the Concession Site." Compl. Ex. A at 5. The lease further provided that

the Bureau would "allow the concessioners to sell their personal property to a new concessioner, provided that the new concessioner agrees to purchase the personal property . . . A new or prospective concessioner will not be required to buy personal property from the concessioners."[3] *Id.* at 2.

In October 2000, the Bureau released a draft Resource Management Plan ("RMP"), in which the Bureau proposed closing the Yacht Basin Concession Area. Compl. ¶ 9. As a result of considerable public objection, however, the Bureau decided against the plan to close the Concession Area. Compl. ¶ 10. Although the Bureau abandoned the plan to close the Concession Area, the plaintiffs claim that for the period of time from October 2000 (when the initial draft of the RMP was issued), to April 2002 (when the second draft was issued), they were in danger of losing their entire investment. As a consequence, they ceased work on improvements in progress and did not initiate new improvements. Compl. ¶ 10. Thus, according to the plaintiffs, the initial draft RMP was, in effect, an anticipatory repudiation of the contract and resulted in lost profits for the balance of the contract term.[4] Compl. ¶ 9. In particular, the Fraziers claim that the draft RMP caused a loss of profits for the period from October 2000 to December 2004. Compl. ¶ 15(a). The lost profits stem from income the plaintiffs claim would have been generated from the rental of boat slips the plaintiffs would have built but for the release of the draft RMP. Pls.' Opp. at 10. The plaintiffs did not build the boat slips after the release of the draft RMP, because they did not believe they would have had enough time to receive a sufficient return on their investment in the new boat slips before the end of the lease term. *Id.*

---

2. A copy of the lease was attached to the Complaint as Exhibit A.

3. The lease states that "personal property" included but was not limited to *"boat docks,"* vehicles, tools, and other equipment and supplies used in the operation of the concession area." Compl. Ex. A at 2 (emphasis added). The lease also contained a nearly identical provision related to improvements. *See id.*

4. The plaintiffs also alleged that the Bureau breached the lease when it failed to renew the plaintiffs' lease or lease the land to a new concessioner. Compl. ¶ 15(b). However, this claim was mooted when the Bureau, on March 21, 2005, entered into a new 20-year lease with the plaintiffs. Pls.' Opp. at 2.

## II. DISCUSSION

### A. Jurisdiction

 The Court has jurisdiction over this case pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), which gives this Court jurisdiction over, among other things, "any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2000). The plaintiffs did not submit their money damages claim in writing to the contracting officer pursuant to 41 U.S.C. § 605(a). Were this contract covered by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, the Court would lack jurisdiction over the plaintiffs' claim for money damages until the contracting officer issued a final decision. *Sharman Co. v. United States*, 2 F.3d 1564, 1568–69 (Fed.Cir.1993) ("a final decision by the contracting officer on a claim ... is a 'jurisdictional prerequisite' to further legal action thereon").

This case is not, however, governed by the CDA, because the contract at issue is a concession contract. The CDA covers four types of Executive agency contracts—contracts for: 1) "the procurement of property, other than real property in being"; 2) "the procurement of services"; 3) "the procurement of construction, alteration, repair or maintenance of real property"; and 4) "the disposal of personal property." 41 U.S.C. § 602(a). Thus, the plain language of section 602 compels the conclusion that "[c]oncession contracts are not contracts within the meaning of the ... the Contract Disputes Act." 36 C.F.R. § 51.3 (2004); *YRT Servs. Corp. v. United States*, 28 Fed.Cl. 366, 392 n. 23 (1993). As the Court noted in *YRT Services*, a concession contract "does not constitute a procurement, but is a grant of a permit to operate a business and the Government is not committing to pay out government funds or incur monetary liability." 28 Fed.Cl. at

392 n. 23; *see also* Concession Contracts, 65 Fed.Reg. 20,630, 20,635 (April 17, 2000) (reasoning that the CDA "by its terms, applies to procurement contracts" and that concession contracts are not procurement contracts, as a "procurement contract is a contract under which the government bargains for, pays for, and receives goods or services").[5] The CDA applies to contracts for the procurement of property, services, or construction; concession contracts are not of that sort; therefore, the concession contract at issue in this case is not governed by the CDA, and the plaintiffs' failure to file a CDA claim does not defeat this Court's jurisdiction.

### B. Standard of Decision

The granting of a motion to dismiss for failure to state a claim under RCFC 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss under RCFC 12(b)(6) the "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In addition to the complaint itself, the Court may consider any written instrument that is attached to the complaint as an exhibit without converting the motion to dismiss under RCFC 12(b)(6) into a motion for summary judgment. RCFC 10(c) ("any written instrument which is an exhibit to a pleading is a part thereof for all purposes"); *see also Morris v. United States*, 33 Fed.Cl. 733, 745 n. 11 (1995) ("Documents accompanying a complaint are considered part of the complaint and, thus, may

---

5. The United States Court of Appeals for the District of Columbia Circuit also concluded that concession contracts were not covered by the CDA. The Court held that the CDA "applies to any express or implied contract for the procurement of property, services, or construction," and the fact that the "government receives monetary compensation or incidental benefits from the concessioners' performance is not enough to

sweep these contracts into the ambit of the Contract Disputes Act." *Amfac Resorts, L.L.C. v. Dep't of the Interior*, 282 F.3d 818, 835 (D.C.Cir.2002) *vacated, Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). The Circuit's opinion was later vacated by the Supreme Court on ripeness grounds.

be considered under a motion to dismiss for failure to state a claim ... without converting the motion into one for summary judgment"); *Kinnucan v. United States*, 25 Cl. Ct. 355, 356–57, n. 1 (1992) (same); 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34 (3d ed.2004).

### C. The Alleged Breach of the Concession Contract

The Fraziers claim that an anticipatory breach of its lease with the Bureau resulted from the latter's release of an initial draft RMP that proposed closing the Concession Area at the end of the plaintiffs' lease term. Compl. ¶¶ 9, 10, 14, 15(a). The Government has moved to dismiss the plaintiffs' case under RCFC 12(b)(6) or, in the alternative, has moved for summary judgment under RCFC 56. In support of the Government's motion, it asserts that the Fraziers have failed to state a claim that the Government breached any term of the lease. For the reasons that follow, as the plaintiffs could prove no set of facts that would support their claim, the Government's motion to dismiss for failure to state a claim is GRANTED.

Contract interpretation is a question of law, *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985), and begins with the plain language of the agreement. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004); *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir.1993). When interpreting the language of a contract, "an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972 (1965). Moreover, "it is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg.*, 169 Ct.Cl. at 388, 351 F.2d 972. In other words, where the language of the contract is clear and

unambiguous "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties." *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987) (quoting *Elden v. United States*, 223 Ct.Cl. 239, 252, 617 F.2d 254 (1980)); *accord McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). A contract provision is not ambiguous when a plain reading of the provision results in only one reasonable interpretation. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76 (Fed.Cir.2004) ("if a contract is reasonably susceptible to more than one interpretation, it is ambiguous."); *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986) ("A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language.").

In order to recover for a breach of contract the plaintiffs must establish: "(1) a valid [lease] between the parties, (2) an obligation or duty arising out of the [lease], (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir.1989). In the case at bar, the plaintiffs have failed to establish the existence of the alleged obligation or duty either to renew the plaintiffs' lease or to lease the Concession Area to a new concessioner at the close of the plaintiffs' lease term. Moreover, the plaintiffs have failed to establish that, even if that obligation or duty existed, the Bureau's release of an initial draft RMP was an anticipatory repudiation of that duty.

#### 1. The Government Was Not Bound to Renew the Lease

In order to support a claim for anticipatory repudiation, the Fraziers must, at the outset, establish that the Government was under a contractual duty or obligation. In other words, where there is no duty, there is no breach. Under the plain language of the plaintiffs' lease, however, the Bureau was not required to renew the plaintiffs' lease at the end of the lease term. Nor did the lease, by its plain language, require that the Bureau

lease the property to a new concessioner at the end of the plaintiffs' lease. The Fraziers contend that the lease placed these obligations upon the Bureau, either to renew or lease to a third party. But, put simply, nothing in the plaintiffs' lease required the Bureau to re-let the Concession Area at the end of plaintiffs' lease term.

As referenced above, the plaintiffs' lease stated that "[u]pon expiration of the lease term, the lease may be re-issued (renewed) to the existing Concessioners for an additional 10 years, but only after [the Bureau] has utilized a competitive bid process to solicit and evaluate alternative proposals for the Concession Site." Compl. Ex. A at 5. The terms of lease respecting the renewal of the lease are clear and unambiguous—they are susceptible to only one reasonable interpretation. The plain meaning of this lease term is that the Bureau *could* have renewed the lease with the plaintiffs, but only after using a competitive bid process. The plaintiffs' suggested meaning—that the Bureau was required either to renew the plaintiffs' lease or to issue a new lease to a different concessioner—*is contrary to the plain meaning.* There is nothing unclear or ambiguous about this contract provision; thus, because "the [contract] provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *McAbee Constr., Inc.,* 97 F.3d at 1435 (quoting *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993)).

In support of their claim, the Fraziers argue that the "lease provided that [the Bureau] will allow the concessioner to sell their improvements to a new concessioner." Pls.' Opp. at 4. The Fraziers reference the provisions of the lease that provided that they would be allowed "to sell their personal property [and improvements] to a new concessioner, provided that the new concessioner agrees to such an arrangement, and provided that both parties agree to an acceptable price for the improvements." Compl. Ex. A. at 2. According to the plaintiffs, the Court should

interpret these provisions to mean that the Bureau was obligated to lease the Concession Area to a new concessioner if it did not renew the plaintiffs' lease—the "lease required that the Bureau start the bidding process before the end of the lease term, and allow time for the Fraziers to sell their improvements to a new concessioner if they were not the successful bidder." Pls.' Opp. at 4. As was the case with the plaintiffs' first argument, however, this argument is not supported by the plain meaning of the lease provision. Properly understood, and read in its full context, this provision of the lease is an exception to the requirement that plaintiffs restore the Concession Area "to its original condition." Compl. Ex. A at 2. As the lease stated:

> All Concessioner owned, provided or constructed fixed improvements to the Concession Area, shall, upon termination of this lease, be removed from the concession area, and the area restored to its original condition. However, Reclamation will allow the concessioners to sell their improvements to a new concessioner, provided that the new concessioner agrees to such an arrangement, and provided that both parties agree to an acceptable price for the improvements.

> All concessioner-provided personal property ... shall upon termination of this lease, be removed from the concession area. However, Reclamation will allow the concessioners to sell their personal property to a new concessioner, provided that the new concessioner agrees to purchase the personal property, and provided that both parties agree to an acceptable price for the personal property.

Compl. Ex. A. at 2.[6] The only contractual obligation these provisions of the lease place on the Government is to allow the plaintiff to attempt to sell any improvements or personal property to a new concessioner—if there is one.[7]

---

6. The lease further provided that, "[u]pon termination of this lease ... the Concessioner will be permitted a period of 90 days to remove all improvements and personal property owned by the Concessioner and restore the premises to a condition satisfactory to [the Bureau]." Compl. Ex. A. at 3.

7. It bears noting that these provisions also state that the new concessioner "will not be required to buy" the improvements or personal property. *See* Compl. Ex. A at 2.

Finally, the plaintiffs assert that the Bureau was not permitted to close the Concession Area at the end of the lease term because "there is no language in the lease that states that the [Bureau] can decide at the end of the lease term to close the Yacht Basin Marina and not lease to anyone." Pls.' Opp. at 4. However, the Government was not required to list each and every action the Bureau could take with respect to the Concession Area after the lease term ended. The fact that there was not a provision in the lease stating that the Bureau could close the Concession Area at the end of the lease term is irrelevant.

In sum, the plaintiffs' arguments in support of their assertion that the Bureau was required either to re-let the Concession Area to the plaintiffs or to lease the Concession Area to a new concessioner contradict the clear, unambiguous, and plain meaning of the terms of the lease. Accordingly, the Bureau was under no obligation to continue allowing a concession operation at the Concession Area at the close of the plaintiffs' lease term.[8]

### 2. Even if the Duties Existed, the Draft RMP Was Not a Breach of the Lease

■ Even if the lease had required the Bureau to choose between renewing the plaintiffs' lease or leasing the Concession Area to a new concessioner, the release of the initial draft RMP was no breach of the plaintiffs' lease. The plaintiffs assert that as the "lease is clear that someone, either the Fraziers or a third party, would be continuing to operate the Yacht Basin Marina ... The action of the Bureau in proposing closure of the Yacht Basin Marina, can be characterized as anticipatory breach of contract, or anticipatory repudiation of contract." Pls.' Opp. at 5–6. The plaintiffs' claim is without merit.

The United States Court of Appeals for the Federal Circuit recognizes two forms of anticipatory repudiation. *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337 (Fed.Cir.2000). The first is the common law form of anticipatory repudiation which requires "an unambiguous and unequivocal statement that the obligor would not or could not perform the contract." *Id.* at 1337; *Dingley v. Oler*, 117 U.S. 490, 503, 6 S.Ct. 850, 29 L.Ed. 984 (1886) (holding the repudiation "must be a distinct and unequivocal absolute refusal to perform the promise"); *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293 (Fed.Cir. 1985). Moreover, under the common law form, the refusal to perform the contractual obligation "must be treated and acted upon as such by the party to whom the promise was made." *United States v. Dekonty Corp.*, 922 F.2d 826, 828 (Fed.Cir.1991) (quoting *Dingley*, 117 U.S. at 503, 6 S.Ct. 850). But what is the unambiguous and unequivocal statement from the Bureau that it would not perform its alleged contractual obligation to lease the Concession Area? Plaintiffs contend it is the release of the *draft* RMP. Even if the plaintiffs' lease obligated the Bureau to maintain concession operations at the site, an initial draft RMP, proposing future options for use of the site and released for public comment, is not the type of absolute statement required under the common law form of anticipatory repudiation.

The second form of anticipatory repudiation is the modern form, which requires that "reasonable grounds support the obligee's belief that the obligor will breach the contract." *Danzig*, 224 F.3d at 1337; *see also Cross Petroleum v. United States*, 54 Fed.Cl. 317, 325 (2002); Restatement (Second) of Contracts § 251(1) (1981). In addition, the obligee must seek "adequate assurance of due performance and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." *Danzig*, 224 F.3d at 1338 (internal quotations omitted). The initial draft RMP, "in which the Bureau proposed closing the Yacht Basin Concession Area," Complaint ¶ 9, is not a reasonable ground to believe the Bureau would breach this alleged obligation to allow concession operations at the Concession Area. The release of the draft RMP did not commit the Bureau to any

---

8. For these same reasons, the plaintiffs fail to state a claim for a breach of the implied covenant of good faith and fair dealing. How the Bureau chose to use public property, after the expiration of the plaintiffs' lease, had no bearing on performance under the lease.

particular course of conduct, much less one that would shut down concession operations at the site.[9]

### III. CONCLUSION

For the foregoing reasons, the Government's motion to dismiss for failure to state a claim is **GRANTED**. The Clerk is directed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**

---

**9.** Had the final RMP eliminated use of the Marina or otherwise closed the Concession Area, the impact of this decision on the value of the Fraziers' improvements and personal property might have supported a claim under the Takings Clause, U.S. Const. amend V. This determination would turn on such factual questions as the economic impact of the RMP and whether the RMP interfered with reasonable, investment-backed expectations. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).