**TGC CONTRACTING CORPORATION,**
Appellant,

v.

**UNITED STATES, Appellee.**

**Appeal No. 84–664.**

United States Court of Appeals,
Federal Circuit.

June 20, 1984.

Frank R. Ciesla, Middletown, N.J., argued for appellant. With him on the brief was Sharlene A. Hunt, Middletown, N.J.

Michael A. Gordon, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Sandra P. Spooner, Asst. Director, and Captain John Stafford, Washington, D.C., of counsel.

Before BENNETT, Circuit Judge, COWEN, Senior Circuit Judge, and NIES, Circuit Judge.

COWEN, Senior Circuit Judge.

This appeal involves a re-roofing contract entered into between appellant (contractor or TGC) and the Department of the Army (Army or government). It was terminated for default by the contracting officer, who also assessed liquidated damages and reprocurement costs against the contractor. TGC appealed to the Armed Services Board of Contract Appeals (Board), which affirmed the contracting officer's decision in all respects.

In its appeal to this court, TGC contends that the failure of the government to pay the contractor for work it performed resulted in the financial inability of the contractor to complete the contract, and therefore that the Board erred in failing to hold that the contract should have been terminated for the convenience of the government, rather than for default.

For the reasons to be set forth, we affirm the decision of the Board.

*Factual Background**

TGC contracted with the Army to repair a large warehouse roof covered with built-up coal tar pitch at an Army Depot near New Cumberland, Pennsylvania, for a fixed price of $235,000. The Invitation for Bids (IFB) indicated that the old roof had to be removed before the installation of a new roof, which was to be covered with asphalt.

The IFB stated that any bidder could make an appointment to inspect the work site and could receive information about the job by telephoning any one of three designated Army engineers. The contractor's principal officer went to the work site, climbed a nearby hill, and surveyed the roof from a distance. Since he mistakenly believed it would be impossible to have a built-up roof made of coal tar pitch when the roof is sloped, he made no inquiry about the work or other inspection of the site. The contractor signed a contract containing the usual Site Investigation clause, acknowledging that he had investigated the site and had satisfied himself regarding the conditions of the work, including the obstacles which would be encountered. TGC's principal officer testified that since the existing roof was covered with coal tar pitch instead of asphalt, as he had believed, the work was delayed for a period of 60–90 days and the cost of the project was considerably increased.

Performance was to begin on September 25, 1978. At the contractor's request, the contract was modified to reflect a starting date of April 15, 1979 and a new completion date of July 31, 1979. However, work did not commence by the modified date, and because it was alarmed by the additional delay, the Army filed a 10–day cure notice stating that termination of the contract would be considered if performance did not begin immediately. Work actually began on May 23, 1979.

---

* These are findings made by the Board which are supported by substantial evidence, or they are facts which are otherwise established by undisputed evidence. *See Blinderman Constr. Co. v. United States,* 695 F.2d 552, 554 n. 2 (Fed.Cir. 1982).

From the outset, TGC disregarded contractual requirements, inadequately staffed and equipped the job, provided faulty supervision of its employees, demonstrated poor management of its performance, and permitted the work to be performed in a sloppy and unworkmanlike manner, contrary to the mandates of the contract, the drawings and the specifications. TGC's deficient performance continued despite complaints by the Army. TGC argued that the delays and problems were caused by the fact that the built-up roof was covered with coal tar pitch, and claimed this was a differing site condition which entitled it to an adjustment for the extra costs of performance and an extension of time for completion. Both the Army and the Board rejected this claim.

On June 22, 1978, the Army sent TGC a show-cause notice, threatening to terminate the contract because of default in performance, lack of satisfactory progress, and poor workmanship. TGC again responded that it was behind schedule because it had to remove the pitch roof which it had not contemplated when it entered into the contract.

TGC also claimed that it had to remove substantially more roof decking than was contemplated in the IFB. When the Army found this claim to be correct, it amended the contract and extended the completion date to August 31, 1979, to allow for any time delays that may have been due to such extra work. The parties then negotiated a modification in which the contract price was increased by $80,000. Funding for the price increase was received on August 20, 1979 and the modification was signed by TGC on August 22, 1979. However, the Army had previously informed TGC that the $80,000 would not be paid until TGC furnished a surety bond, as required by the contract, to cover the increase. TGC did not provide the surety bond and the modification was never consummated.

During July and August when the efforts to increase the contract price were undertaken, TGC continued to exhibit inadequate staffing, disregard of contract requirements, faulty workmanship, lack of equipment, and lack of progress sufficient to insure that the job would be finished by the contract completion date. By the end of August 1979, TGC still had 2 months of work to do, and the work that had been completed was unacceptable because the roof leaked when it rained.

At the time it submitted its bid, TGC was insolvent. Its liabilities exceeded its assets by a ratio of 2 to 1. It could not pay its current debts and did not have sufficient working capital to finance the performance of the contract. When the contract was executed, TGC was burdened with $350,000 of debt which required interest payments of at least $20,000 per year. Since it had little working capital to start the job, it assigned to a bank the moneys to be received under the contract. The bank deducted 25 percent from all proceeds paid by the Army and applied it to TGC's debt to the bank. The remainder was to be given to TGC for its use. TGC received progress payments totaling $149,525, but only $88,000 was applied to the costs of performance. Approximately $62,000 was used to repay loans owed by TGC before it entered into the contract. In September 1979, the assignee bank refused to advance additional money to TGC, and on September 20, 1979, the work force abandoned the job and never returned.

Immediately after the job was abandoned, the Army sent TGC a written 10-day cure notice, demanding completion of the contract in a timely manner. When no action was taken by TGC, the Army terminated the contract on October 29, 1979, pursuant to the Termination-for-Default clause.

The Army made progress payments to TGC in accordance with the contracting officer's determination of the amount of work completed, less 10 percent which was retained as authorized by the contract. The Board correctly concluded that TGC had been paid for all labor and materials actually installed, and the Army's failure to pay the full amount of TGC's invoices was

due to TGC's incomplete and inadequate performance.

## ANALYSIS

■ It is well established that the poor financial condition or insolvency of a contractor ordinarily is not a sufficient excuse for a contractor's default in the performance of a contract. *Preuss v. United States,* 412 F.2d 1293, 1302 (Ct.Cl.1969); *Consolidated Airborne Systems, Inc. v. United States,* 348 F.2d 941 (Ct.Cl.1965). However, when the financial incapacity of the contractor to perform is caused by the acts or omissions of the government, the default is excused and the contract is deemed to have been terminated for the convenience of the government, where, as here, the contract contains a Termination for Convenience clause. *National Eastern Corp. v. United States,* 477 F.2d 1347, 1356 (Ct.Cl.1973).

■ When, as in this case, the contractor claims that his financial inability to perform is due to the government's failure to make the required progress payments, the burden is on the contractor to establish that the progress payments were erroneously withheld and that the withholding of such progress payments was the primary or controlling cause of the contractor's default. *R.C. Hudson & Associates, Inc.,* 76–2 BCA ¶ 12,201 (1976), and *Guenther Mfg. Co., Inc.,* 73–2 BCA ¶ 10,327 (1973). It is obvious from the facts recited above that TGC failed to meet that burden in this case. On the basis of findings amply supported by the evidence, the Board concluded that TGC's failure to complete the contract as required was the direct result of its lack of working capital, its negligence, and its own actions. We hold that this conclusion is correct and is fully supported by the record.

The decisions relied on by TGC are distinguishable on their facts and do not support its position.

In *Spiritual Sky Scented Products,* 82–2 BCA ¶ 15,948 (1982), the Board found that the contractor was prevented from performing a terminated contract by the financial stress caused by the government's long-delayed acceptance and payment for supplies purchased under the contract.

In *Curtis L. Holt d/b/a Advance Maintenance Company,* 76–2 BCA ¶ 11,999 (1976), the Board found that the government had breached the contract by its failure to inspect the work as required and by failing to make timely payments that would have been due as the result of such inspection. The Board then held, that since the contractor's financial difficulties resulted from these acts of the government, the default was excusable.

In *Pacific Intermodal Corp.* 73–2 BCA ¶ 10,151 (1973), the Board found that shortages and delays were caused by the government's failure to furnish containers as required, and by its furnishing inadequate dock plates for loading the containers. The Board also found that the contractor encountered difficulties and performed extra work which was not contemplated by the contract and that the government's denial of additional compensation therefore exhausted the contractor's financial resources. Therefore, the Board concluded the contract should have been terminated for the convenience of the government rather than for default.

In *Contract Maintenance Inc.,* 75–1 BCA ¶ 11,207 (1975), the Board found that while the government was entitled to deduct amounts from progress payments that reasonably reflected the reduced value of the services received, the government had failed to pay the actual value of the services performed. Consequently, the Board decided that the government's refusal to pay the amounts known to be due relieved the contractor from continuing performance and converted the termination into one for the convenience of the government.

In *Valley Contractors,* ASBCA No. 9397, BCA ¶ 4,071 (1964), the Board found that the evidence did not establish that the contractor's work was defective or that he had refused to comply with a cure notice. Despite the fact that the government ad-

mitted that 51 percent of the contract had been performed, no progress payment had been made to the contractor. Therefore, the Board concluded that the contractor's default was excusable.

We have applied the statutory standard of review to the record and find that TGC has failed to establish any ground for reversal of the Board's decision. Accordingly, the decision is *affirmed*.

AFFIRMED.