ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Rashed Elham Trading Company )    ASBCA Nos. 58383, 58619, 58620
)
Under Contract No. W91B4N-11-D-7001 )

APPEARANCE FOR THE APPELLANT:    William J. Spriggs, Esq.
                                 Spriggs Law Group
                                 Lynchburg, VA

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                                   Army Chief Trial Attorney
                                   MAJ Christopher M. Coy, JA
                                   Erica S. Beardsley, Esq.
                                   Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE NEWSOM

These appeals concern the termination for cause of a commercial contract to transport cargo and fuel in support of contingency operations in Afghanistan, and a related claim for breach of contract. After a hearing and post-hearing briefing, the Board upholds the termination and denies the appeals.

FINDINGS OF FACT

1. On 12 August 2011, the Bagram Regional Contracting Center, a component of the United States Department of Defense Central Command, awarded Contract No. W91B4N-11-D-7001 (contract) to appellant, Rashed Elham Trading Company (RETC) (R4, tab 1 at 2, 76). This contract was one of several National Afghan Trucking (NAT) contracts awarded to contractors to transport supplies, equipment, and other assets to and from sites in Afghanistan (*id.* at 77; tr. 1/33).

2. RETC's NAT contract was an indefinite-quantity, indefinite-delivery contract for an estimated value of AFN 20,771,689,159 in Afghanistan currency (R4, tab 1 at 2, 4). The contract included a 12-month base period of performance from 16 September 2011 to 15 September 2012, followed by 2 option periods which together totaled 15 months (*id.* at 14; tr. 1/29).

3. The contract incorporated FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010). Subsection (m), entitled Termination for cause,

identifies the permissible grounds for a termination for cause, stating in relevant part:

> The Government may terminate this contract, or any part
> hereof, for cause in the event of any default by the Contractor,
> of if the Contractor fails to comply with any contract terms
> and conditions, or fails to provide the Government, upon
> request, with adequate assurances of future performance.

(R4, tab 1 at 15)

4. Transportation missions were divided into three categories, called "suites." Suite 1 was for transportation of bulk fuels, Suite 2 was for transportation of dry cargo, and Suite 3 was for transportation of heavy cargo (R4, tab 1 at 9-13; tr. 1/33).

5. The contract's Performance Work Statement (PWS) described the work, performance standards, and procedural requirements. Pursuant to Subpart 1.4, RETC was required to provide "secure ground transportation of [various classes of] cargo throughout Afghanistan" and "all management and logistics support resources necessary to pickup material and equipment at origin and deliver material and equipment at destination on the dates required by the USG" and required to "ensure the integrity and safety of the materials and equipment being transported" (R4, tab 1 at 77).

I. Significant Contract Requirements

A. Minimum Assets

6. Three general categories of contract requirements are significant to this dispute. First, PWS Subpart 5.1 and Technical Exhibit 4 required RETC to maintain availability of a minimum number of assets for assignment of transportation missions (R4, tab 1 at 82-83, 99). "Assets" in this context meant trucks, containers, and specialized trailers called "lowboys" or "super lowboys" (id. at 99). PWS Subpart 6.2 required RETC daily to report the status of its assets, including "assets available for dispatch within 96 hours" (id. at 90).

B. Documented Compliance with Mission Requirements

7. Second, the PWS set forth detailed performance and documentation requirements. The government initiated a mission by issuing to RETC a Transportation Movement Request (TMR), also called a "mission sheet." (R4, tab 1 at 91, 101; tr. 1/34) The TMR defined mission requirements, which could include origin and destination, dates for pickup and delivery, the commodity being transported, required security, or other data (R4, tab 165 at 1615, tabs 22-23, 69 at 651; tr. 1/34, 92-93). Pickup was

2

known as "upload" and the date for pickup was called the "required spot date" or RSD.[1] Delivery was known as "download" and the date for delivery was alternately called the "required download date," or "required delivery date," or RDD. (R4, tab 1 at 26, 93)

8. At upload and download, RETC was required to obtain signatures of authorized government personnel on the TMR; these signatures verified that the cargo had been picked up and delivered (R4, tab 165 at 1615-17; tr. 1/91-93). PWS Subpart 6.7 required RETC to submit the original, signed TMR to the government "within 28 days" after delivery. If a TMR had been misplaced or a signature could not be obtained, RETC could obtain a memorandum from the government customer, in lieu of the TMR, verifying mission performance. (R4, tab 1 at 91; tr. 2/153)

9. Along with the TMR, RETC was required to submit other supporting documentation, notably, satellite transponder "snapshots." PWS Subpart 4.4 required RETC to attach to its vehicles a satellite transponder that transmitted signals showing the vehicle location at points in time[2] (R4, tab 1 at 81-82; tr. 1/41-44). Snapshots would show that RETC showed up at the correct locations by the RSD and RDD and would establish wait times for demurrage requests.[3]

10. PWS Subpart 6.7 warned that "suspected fraudulent or altered mission sheets will be investigated by the USG. Payment for any suspected fraudulent or altered mission sheets will be suspended pending the results of the investigation." (R4, tab 1 at 91) In addition, certain performance deficiencies could cause the government temporarily to suspend a contractor from eligibility for new missions until the contractor submitted a corrective action plan, acceptable to the government, to prevent reoccurrence of the deficiency (*id.* at 49).

C. Invoicing and Payment Requirements

11. The third category of significant contract requirements were those governing invoicing, principally Paragraph K and PWS Subpart 6.6 (R4, tab 1 at 5, 90-91).

12. Paragraph K required RETC to coordinate with the government to "review all completed missions against the contract requirements" in advance of invoice submission. It did not specify who would prepare invoices. Paragraph K stated in

---

[1] In the original contract, the date for pickup was called "required load date" or RLD. Later, the contract was modified to change this term to "required spot date" or RSD. (R4, tab 26 at 349)

[2] Modification No. P00001 required RETC to submit snapshots with its TMRs to verify timely performance (R4, tab 6 at 117 and Revised PWS at 7).

[3] "Demurrage" refers to excess time spent waiting on location for upload or download. PWS Subpart 5.9 entitled RETC to compensation for demurrage (R4, tab 1 at 84).

relevant part:

> Prior to the monthly invoice submission, the contractor and the Government will meet to review all completed missions against the contract requirements. The Contractor should have their draft invoice, using the format in Solicitation Attachment 5, and all supporting documentation covering the requirements of the PWS paragraph 6.6 available for discussion.

(R4, tab 1 at 5)

13. PWS Subpart 6.6 also did not specify who would prepare invoices, but required RETC monthly to submit an invoice "that includes all missions that are closed out each month." It stated in full:

> The Contractor shall provide an invoice to the USG monthly that includes all missions that are closed out each month for the invoicing period. The invoice will include charges for all successfully completed missions, cancelled/prorated missions, and demurrage, less all applicable deductions. Deductions may include charges for missing cargo items for which the Contractor is held financially liable, any items furnished by the USG (IAW ¶ 4.2.3, 5.11.2.1.2, 5.12.3.1.2), PRS deductions, and applicable Contractor demurrage (IAW ¶ 5.11.5.4, 5.12.5.4).

(R4, tab 1 at 90-91)

14. A mission would be deemed "failed" – resulting in no pay – for many reasons including RETC's failure to arrive at the origin or destination on time, its excessive loss of fuel during a fuel delivery mission, RETC's submission of "falsified or tampered mission paperwork" or if "cargo delivery cannot be verified." The government could deduct from RETC's payments for lost or damaged cargo, RETC's failure to achieve performance quality standards, or other noncompliances. (R4, tab 1 at 84, 90-91, 94)

15. On 16 October 2011, the government issued a Memorandum for Record (MFR) establishing deadlines for submission of TMRs and assigning responsibilities for invoice preparation. This MFR, which was not incorporated into the contract through a contract modification, stated in relevant part:

> The 257th JMCB has established the following timeline for the Nation[al] Afghan Trucking (NAT) contract monthly

4

invoice. The dates listed below will happen each month, regardless which day of the week the date falls on.

   a. 16th-15th (monthly), Mission sheets are turned in for the billing
   b. 16th-NAT Cell prepares the invoice for COR review
   c. 17th-18th, COR reviews the prepared invoice
   d. 18th- pre-invoices is sent to the carriers
   e. 19th-20th, Carrier has time to review the pre-invoice
   f. 21st-22nd, Discussion period between the COR and Carrier for monthly invoice (closeout)
   g. 23rd -24th, Carrier prepares the final invoice for WAWF[4] or paper invoice for turn-in
   h. 25th (per PWS 6.6, deliverable), The final invoice for that month is submitted in WAWF or sent via email to the COR.

(App. supp. R4, tab A-10)

16. Two aspects of this MFR are significant. First, *before* invoice submission, the contracting officer's representative (COR) was to review the documents submitted by RETC to determine which missions were completed and entitled to payment, and whether any deductions should be applied. Second, *the government* – not RETC – was to prepare draft invoices. RETC could review and contest them, but ultimately RETC was required to submit a government-approved invoice for payment. (App. supp. R4, tab A-10; tr. 2/104-08)

II. RETC's Performance Problems

17. Problems with RETC's performance surfaced shortly after RETC began performance in September 2011 and persisted throughout the approximately nine months that RETC accepted missions. In that period, the government issued at least seven "Letters of Concern" to RETC regarding what the government perceived as RETC's noncompliance with contract requirements or other performance issues (R4, tab 3 (failure to submit deliverables), tab 35 (super lowboy (SLB) inspection), tab 43 (SLB noncompliance), tab 93 (pilfered container), tab 115 (insufficient assets), tab 137 (failure to satisfy acceptable quality levels), tab 141 (various matters)).

18. As detailed below, on three occasions the government suspended RETC from eligibility for new missions until it submitted an acceptable corrective action plan to

---

[4] Invoices were to be submitted into the Wide Area Workflow (WAWF), a Department of Defense application (R4, tab 6 at 132, tab 9 at 142).

address what the government perceived as performance deficiencies. On other occasions, the government deemed RETC to be responsible for a variety of performance problems.[5] (Findings 19, 22, 24, 29, 36, 40, 47)

## A. First Suspension

19. The first suspension occurred on 7 January 2012, when the government suspended RETC from eligibility for certain missions for RETC's failure to maintain a sufficient number of assets called "super lowboys" (R4, tabs 45, 46). RETC submitted a corrective action plan, which was accepted, and the government lifted the suspension on 18 January 2012 (R4, tab 57).

## B. Accident Damaging Mine Resistant Ambush Protected Vehicle

20. Another problem arose on 22 January 2012, when RETC's subcontractor crashed while transporting a government-owned Mine Resistant Ambush Protected (MRAP) vehicle, costing $224,341.94 in repairs (R4, tabs 75, 118-19, 129; tr. 1/49). On 29 March 2012, an investigator concluded that "[o]verwhelming facts point to the possible cause as either mechanical issues or the driver" (R4, tab 119 at 1100).

21. PWS Subpart 5.7, Cargo Responsibilities, provided in pertinent part that:

> It is the Contractor's responsibility to properly secure loads for transport IAW PAM 55-20. *The Contractor shall be financially liable for cargo loss, pilferage, or damage incurred due to improperly securing cargo loads, negligent or improper driving by the operator, improperly handling cargo, or unauthorized trans-loading or cross-loading of cargo.*

(R4, tab 1 at 84) (Emphasis added)

22. On 30 March 2012, the government notified RETC that it would hold RETC liable for the repair costs. At the time, RETC did not object to being held liable; it only objected to the amount that RETC was charged, stating that RETC "should only be liable for the repairs not an added expenditure limit." (R4, tab 128 at 1233-34, tab 129; tr. 2/93-94)

---

[5] Despite the performance problems, the government's monthly surveillance reports assessed RETC as compliant with the contract requirements, at least for the period September 2011 through February 2012 (R4, tabs 8, 24, 44, 133-34). The COR testified, and we find, that the monthly surveillance reports were based on incomplete information and were inaccurate (tr. 3/132-33).

## C. Second Suspension

23. RETC's second suspension occurred on 8 March 2012 and arose out of a theft of a government container (R4, tab 93). Between 29 October 2011 and 22 November 2011, a government container went missing while being transported by RETC (R4, tab 25 at 339-40). In response to government queries, RETC at first asserted that the container had been delivered, and provided the "completed TMR#AAJ4928" for the mission (R4, tab 25 at 341, 345; tr. 2/72). Investigators determined that the container had likely been stolen and the signature on the TMR likely had been forged (R4, tab 69 at 648, 651, tab 70 at 658; tr. 2/81-82).

24. On 8 March 2012, the government suspended RETC from new missions until it submitted a corrective action plan (R4, tab 93 at 944). At the time, RETC conceded that the container had been stolen and the TMR had been forged, but blamed its subcontractor, stating:

> RETC does acknowledge that a registered
> sub-contractor for RETC was involved with an incident that
> initiated an investigation by CID.
> Omar Amin Trading Company was involved in theft of
> USG property and forgery in an attempt to collect payment....
>
> ....
>
> RETC does understand that we are liable for
> the actions of all sub-contractors and drivers of each
> sub-contractor.

(R4, tab 99 at 980; tr. 1/81)

25. On 15 March 2012, the government lifted RETC's suspension but noted that RETC would be held liable for $257,675.00 in lost property (R4, tabs 70, 91, 100, 830 at 379-383; tr. 2/83). As later developments showed, pilferage and concerns about possible forgery on RETC missions persisted (findings 27, 36, 41, 50).

26. Indeed, a few weeks later, on 8 April 2012, RETC submitted to the government a memorandum, apparently signed by a government official, stating that the missing container had been located. RETC requested reimbursement for the charges assessed against it for the lost property. (R4, tab 149 at 1499-1500)

7

27. The person who purportedly signed this memorandum, SGT Erika Brooke,[6] informed the COR that "[t]his is a forged memorandum of my signature. I have no[t] produced a memorandum like this and this is not my signature." (R4, tab 150 at 1502) She testified that the signature was "completely not mine" and that the memorandum had not been prepared by her (tr. 2/85-89).

## D. Difficulties with Invoicing and Payment

28. In December 2011, RETC submitted invoices for missions completed between 16 September 2011 and 15 November 2011, and received payment of $509,470.26 on 24 January 2012 (R4, tabs 7, 11, 66). Thereafter, RETC experienced difficulties with invoice preparation (R4, tab 71 at 662, tab 84 at 832; tr. 1/101-03).

29. In many instances, RETC submitted late, incomplete, or inaccurate TMRs, or TMRs that the government suspected were forged (R4, tab 165; tr. 1/91-96, 2/69-72). SGT Brooke testified that when submitting requests for payment for demurrage, RETC's packages were "improperly put together." She "explained several times" to RETC's program manager "how to do this," adding:

> [F]or the most part the carriers could all put this together properly. But for some reason I just had issues with RETC.
>
> ...I explain[ed] to him that I need snapshots of the truck at origin or destination.... I need to know if your truck arrived at origin or destination on time because if they didn't you're not entitled to the demurrage per the PWS.
>
> So I needed that, and he didn't provide it.

(Tr. 2/69-70)

30. If RETC lacked records to support payment, the government would allow it to roll that TMR over to the next month "giving the carrier [a] whole other month to find information on that TMR" (tr. 2/111). In other instances, RETC failed to perform in accordance with the PWS, or government property went missing, resulting in a mission failure with no pay, or deductions (R4, tabs 91, 148-49, 383, 385; tr. 2/72-78, 82-89, 96-97). The government rejected approximately 55 percent of the invoices that RETC submitted, and on at least one occasion it took RETC months to revise and resubmit the paperwork (R4, tab 406; tr. 1/27-28, 35-36).

---

[6] SGT Brooke was later promoted (tr. 2/64). We refer to SGT Brooke by the rank she held during the events leading up to the termination.

31. CPT Joseph Guess, the COR, reviewed TMRs submitted by RETC. He noted that he "personally [spent] hours confirming all the no shows" – meaning occasions in which RETC trucks did not arrive to pick up cargo (R4, tab 109 at 1032). Concerns about possible forgeries required additional investigation. For instance, while investigating a TMR turned in by RETC, CPT Guess asked a military service member whether his signature on a TMR was authentic. He replied, "[t]hat is not my writing on that TMR. My name is misspelled for one." (R4, tab 107 at 1024-26)

32. RETC contends that the government was slow to prepare invoices and that the resulting payment delays caused problems with RETC subcontractors "because they were not being paid" (tr. 3/24). RETC's evidence, including an invoice tracking log and emails complaining about slow delivery of invoices, is unpersuasive. While RETC's evidence established that there were delays in invoice preparation, it does not establish that the government caused these delays (R4, tabs 71, 90, 138, 192, 283; supp. R4, tab 406; tr. 3/23-24). In contrast, the government presented evidence that RETC's submission of late, incomplete, or inaccurate TMRs caused delay (R4, tab 109 at 1032, tab 165; tr. 1/91-96, 2/69-72).

33. Also, RETC offered no financial records or communications with subcontractors demonstrating a causal connection between delayed payments and poor subcontractor performance. Considering all the evidence, we find that government payment delays were not a controlling cause of RETC's performance problems.

34. Nevertheless, RETC complained about government rejections of its TMRs, particularly for fuel missions (R4, tab 84 at 832). On 22 March 2012, RETC's Program Manager, Ricky Jordan, claimed that the government improperly rejected "hundreds" of RETC's fuel TMRs that had "clear undeniable signatures," stating:

> There is a serious disconnect between the downloading units and the units doing the DD250[.] The military can say any signature[] is suspicious and that in turn hits the carrier with forgery. The military does not have a verifiable means of verifying signatures or persons dedicated to downloads or DD250 preparation and this leaves the carrier no way to defend its self.

(R4, tab 108) He requested a meeting with the contracting officer and COR (*id.*).

E. Pilferage of Government-Owned Fuel During RETC Fuel Missions

35. LTC Edward Gosline, who was the contracting officer at that time, and CPT Guess met with RETC on 22 March 2012 (R4, tab 109; tr. 1/26, 74-76, 2/169). Based upon subsequent events detailed below, we surmise that LTC Gosline and

CPT Guess informed RETC during this meeting that government fuel had disappeared during RETC fuel transportation missions and that RETC would be charged for the losses.

36. The following day, 23 March 2012, RETC's Mr. Jordan, admitted that approximately 80,000 gallons of government fuel "had come up missing," and blamed an RETC subcontractor for the losses (tr. 1/74-76, 3/55, 117-19; R4, tabs 111-12).

37. These fuel losses could, under the contract, be charged to RETC. PWS Subpart 5.10.5 contemplated that some fuel loss on a fuel delivery mission could occur, and fuel loss of up to five percent was acceptable. But fuel loss of greater than five percent would result in a failed mission, no pay, and a charge to the contractor for missing fuel. Subpart 5.10.5 stated:

> *The Contractor shall be financially liable for missing and/or contaminated fuel at the rate of AFN 737 per gallon.* The Contractor will be charged a maximum of AFN 3,685,000 for 5,000 gallon fuel tanker missions and a maximum of AFN 7,370,000 for 10,000 gallon fuel tankers missions. Fuel losses of up to five percent (5%), due to evaporation and all other reasons (including inaccuracy of measurement) are acceptable. *Fuel missions with losses exceeding 5% are considered a failed mission.* This 5% allowance is not applicable to instances when the entire load is missing; the Contractor will be held liable for 100% of the fuel uploaded. If there is fuel remaining in the tanker after download, the Contractor must return all remaining fuel to the location designated by the USG.

(R4, tab 1 at 85) (Emphasis added)

38. On 25 March 2012, RETC requested, and was granted, permission temporarily to report fewer than minimum assets available "until [RETC] figure[s] out the extent of the problems with our subs" (R4, tab 115 at 1048, tab 116 at 1052; tr. 1/72). Starting 5 April 2012 and continuing for the next five months until its termination in September 2012, RETC reported zero assets available for new missions (R4, tabs 167, 169; tr. 2/177, 3/115, 120).

39. Mr. Jordan denied knowledge of the fuel pilferage and blamed his lack of awareness on the government's slowness in preparing invoices, stating:

10

> Due to not receiving of the invoices on time from our
> previous COR, RETC was not able to distinguish or aware of
> the pilferage problems with the sub contractors[.]

(R4, tabs 115-16 at 1051-52) He testified that "the only way that I could track performance was by the comments from the Government," and reiterated that he did not know that TMRs had been falsified or that fuel was being pilfered until the government so informed him (tr. 3/40-42, 54). Apart from this testimony, which is conclusory, RETC provided no explanation of why it was unable to detect that its subcontractor had not been delivering fuel and was apparently stealing it.

### F. Failure to Meet Acceptable Quality Levels, Failure to Submit a Corrective Action Plan, and Submission of Allegedly-Falsified TMRs

40. Thereafter RETC's performance problems snowballed. On 3 April 2012, the government issued a letter of concern for RETC's failure to achieve minimum quality standards (R4, tab 137). The PWS acceptable quality level (AQL) required the contractor to be available on time for upload for 90% of missions (R4, tab 1 at 93), and to submit 90% of mission sheets to the government on time (*id.*). The government asserted that RETC failed to achieve either of these standards for certain suites and directed RETC to submit a corrective action plan by 10 April 2012 (R4, tab 137).

41. On 4 April 2012, the government identified at least four fuel TMRs submitted by RETC that the government suspected had been forged or altered to indicate, inaccurately, that an amount of fuel above the 95% acceptable threshold had been delivered (R4, tab 140; tr. 2/163-64).

### G. RETC Excuses for Performance Deficiencies

42. Mr. Jordan testified that the government was to blame for RETC's failure to meet RSDs and for fuel losses. According to him, government holding yards were too small to accommodate the volume of delivery trucks. If a holding yard was too full to enter, the driver was unable to obtain a snapshot at the required time and location to meet the RSD. The mission would be recorded as "no pay" or "failed mission." (Tr. 3/69-70) Mr. Jordan also asserted that the government caused fuel loss by making trucks wait for days to download. While waiting, the driver "had to run the trucks to stay cool or stay warm.... That mean[t] burning of fuel." The truck would be "out of compliance" with the fuel requirement, resulting in a backcharge to RETC for missing fuel and the mission treated as a "no pay" or "partial pay." (Tr. 3/70-71)

43. This testimony is unconvincing for three reasons. First, it is self-serving and RETC has not directed us to corroborating evidence. Second, we cannot credit Mr. Jordan's assertions as to RETC drivers' conduct during missions because Mr. Jordan

admitted that he was unable to monitor his drivers. He testified that "the only way that I could track performance was by the comments from the Government." (Tr. 3/40-42) Third, government testimony established that RETC had avenues available to it to redress these problems (tr. 3/139-40).

## H. 4 April 2012 Meeting with the Contracting Officer and Third Suspension

44. On 4 April 2012, Mr. Jordan again met with government representatives including CPT Guess and LTC Gosline (R4, tab 141; tr. 1/85-86, 3/45-46).

45. LTC Gosline recalled that the meeting "essentially culminated to the point where [RETC] wanted to know how they could be terminated from the contract" (tr. 1/86). CPT Guess concurred (tr. 2/174). Mr. Jordan testified that he "wanted to talk to them about options for RETC.... They told me the process that would occur if I didn't continue to perform. They told me what I would have to do in order to stop that process of default determination and what would happen if I didn't." (Tr. 3/46-48)

46. Shortly after the 4 April 2012 meeting,[7] RETC sent a letter announcing that "RETC is cancelling our contract." The letter stated in pertinent part:

> RETC is cancelling our contract W1B4N-11-D-7001
> SUITE 1- BULK FUELS SUBCLIN-001AA, SUITE 2-DRY
> CARGO SUBCLIN-0001AB, AND SUITE 3 HEAVY
> CARGO SUBCLIN- 0001AC effective May 3, 2012.
>
> RETC is cancelling contract W91B4N-11-D-7001 as per
> terms of the contract, RETC is providing 30 day advanced
> notice, so the contract will terminate May 3, 2012.

(R4, tab 90) RETC explained that it "is terminating this contract due to the Government Body violating their agreement under PWS Part 6: Deliverables Descriptions (reference Technical Exhibit 2) section 6.6 Monthly Invoices." The letter detailed what RETC characterized as government violations and claimed financial harm, stating:

> RETC operated with no funds for services rendered due to no
> invoices to enter into WAWF for payment, 6 months of
> operation with over a $10 million USD investment and have
> no return on investment has placed RETC on the brink of
> Bankruptcy forcing RETC to have to terminate the contract

---

[7] The letter bears the date 4 March 2012, but witnesses from both parties testified that that date was in error. We find that that the letter was received after the 4 April 2012 meeting. (Tr. 1/87, 3/26; R4, tab 90)

12

for W91B4N-11-D-7001 for convenience of the USG and its
valuable cargo due to the inability to continue to operat[e]
contract W91B4N-11-D-7001 with depleted funds and give
the USG the standard Performance required by the contract.

RETC promised to complete existing missions, stating:

> RETC understands that a 24 Hour Operation and all standards
> of the PWS must be adhered to until the finale issued TMR
> currently operating a mission is completed and turned into
> COR for review and issue on Finale invoice submitted into
> WAWF.

(R4, tab 90)

47. On 5 April 2012, the government suspended RETC for the third time and
rescinded RETC's permission to report minimal assets. The government directed that
RETC submit a corrective action plan by 19 April 2012. (R4, tabs 141, 146)

48. Instead of submitting a corrective action plan, RETC inquired "[w]hen will
RETC receive letter of default for this contract?" The government replied as follows:

> Basically there are two courses of action:
>
> 1) If RETC cannot, or chooses not to, submit a [corrective
>    action plan] by 19 April, procedures for proceeding
>    towards termination will then [be] initiated, which will
>    include a cure notice or show cause notice.
>
> 2) RETC may submit a corrective action plan (CAP) by the
>    suspense date listed in the letter. If the CAP is accepted,
>    RETC would be removed from suspension and would be
>    required to report assets at that time, and could continue
>    work. If RETC fails to report adequate assets at that time,
>    procedures for proceeding towards termination will be
>    initiated, which will include cure notice or show cause
>    notice.

In either case, it is the discretion of RETC as to the course of action to take.

(R4, tab 143 at 1459)

49. The government asserts that RETC did not submit a corrective action plan in response to the 4 April 2012 notice (tr. 1/101). RETC does not contend otherwise. We find that RETC did not submit this corrective action plan.

I. Submission of Additional Documents that the Government Believed were Forged

50. On 20 April 2012, the government identified at least four more TMRs submitted by RETC that the government suspected had been altered or forged (R4, tab 165).

51. In May 2012, RETC submitted a memorandum purportedly signed by a military officer stating that the MRAP accident was not RETC's fault (R4, tab 179). The government believed this memorandum had been fabricated, in part because the investigator "could not find any proof" of the existence of the author, and because of irregularities in the memorandum [8] (*id.*; tr. 2/96-97).

III. Cure Notice and Termination

52. On 24 April 2012, the government issued a cure notice to RETC, stating that its "overall lack of compliance and failure to perform" were "conditions that are endangering the performance of the contract." The "conditions" included fuel and cargo pilferage; RETC's submittal of documents that the government characterized as "fraudulent" or "forged"; RETC's failure to report adequate minimum assets; its driver's error resulting in government property damage; and what the government characterized as RETC's expression of a desire "to be removed from the contract." The notice stated that "[u]nless the above described conditions are cured within ten (10) days of receipt of this notice, the Government may terminate for default in accordance with [FAR 52.212-4(m)]." (R4, tab 170; tr. 1/99-100)

---

[8] The memorandum stated that "due to Military negligence" the mission "resulted in damage of the vehicle; the carrier is not responsible for damages." The memorandum identified the point of contact as "ILT Williams" at "William.leonard@afghan.swa.army.mil," and was signed "Williams Leonard." (R4, tab 179 at 1871)

14

53. RETC acknowledged receipt on 24 April 2012, but otherwise did not respond to the cure notice (R4, tab 171 at 1667; tr. 1/100, 127, 3/121).

54. Mr. Jordan asked the government "if RETC responded to the Cure Notice and we provided the documentation requested in the Cure Notice, if we would have to immediately start performing under all three suites again." The answer was yes. Then he asked "if RETC does not respond to the Cure Notice, what would be the result of that." He was informed that the government "would start preparing to terminate [RETC] from the contract." (Tr. 3/58)

55. Mr. Jordan discussed it with the owners of RETC and together they determined not to respond to the cure notice, reasoning as follows:

> By answering the Cure Notice that would mean that I needed to have fuel trucks available. I didn't have the funds, we hadn't been paid, I didn't have the funds to continue. So I couldn't hire a new Suite 1 subcontractor. If I addressed and I answered the Cure Notice then I would have to continue on dry and heavy and I didn't have the funds to pay them to continue. We had already depleted all of our funds over a year's time.
>
> ....
>
> We couldn't come up with any other funding in any other manner, so the only thing that I could do without putting anymore US cargo in jeopardy of being lost, I did not respond to the Cure Notice.

(Tr. 3/58-59) We infer that the reason RETC elected not to respond to the cure notice is that it wished to be terminated. As noted above, for the remainder of its contract, RETC reported zero assets available (finding 38).

56. Ms. Efstathia Fragogiannis took over as contracting officer in June 2012. She determined to terminate RETC for cause. (Tr. 1/122, 124-29)

57. On 15 September 2012, she issued to RETC a notice terminating the contract for cause. The notice cited the following reasons: (1) previous letters of concern and suspensions; (2) RETC's failure to comply with super lowboy requirements; (3) pilferage of a government container while being transported by RETC and alleged forgery of the TMR by an "unknown" person; (4) RETC's request to report minimal assets due to "excessive pilferage" of fuel; (5) RETC's failure to achieve minimum acceptable quality

thresholds for certain requirements from September to December 2011; (6) RETC's correspondence stating that it was canceling the contract; (7) the accident that damaged a government MRAP being transported by RETC; (8) RETC's submission of TMRs that the government believed had been altered or forged; (9) RETC's failure to submit a corrective action plan in response to the government's concerns; and (10) RETC's failure to submit a response to the cure notice or to cure the underlying concerns. (R4, tab 246)

58. On 15 September 2012, the contracting officer executed contract Modification No. P00010, terminating the contract for cause under FAR 52.212-4(m) (R4, tab 245).

IV. Claims and Appeals

59. On 12 November 2012, RETC submitted to this Board an appeal from the contracting officer's decision to terminate the contract for cause. The appeal was docketed as ASBCA No. 58383.

60. By letter dated 6 February 2013, RETC submitted a certified claim to the contracting officer in the amount of $5,763,180 alleging that the government breached the contract. RETC alleged that the government:

> [B]reached its duty of good faith, fair dealing and the duty to cooperate and not interfere in RETC's performance by failing to properly administer the contract, by failing to heed RETC's clarion calls for assistance, by failing to pay RETC as required by the contract, and by failing to provide commercially practicable contractual requirements and by improperly terminating the contract for cause rather than for convenience.

(Supp. R4, tab 356)

61. By 12 April 2013, no contracting officer's final decision regarding the claim had been issued, and RETC filed a notice of appeal from a deemed denial of the claim. The appeal was docketed as ASBCA No. 58619. On 14 April 2013, the contracting officer issued a written final decision denying RETC's claim. (Supp. R4, tab 357) On 15 April 2013, RETC filed its notice of appeal of the contracting officer's final decision to deny its breach of contract claim. The appeal was docketed as ASBCA No. 58620. The appeals were consolidated (Bd. corr. ltr. dtd. 15 April 2013).

62. We expressly do not make any findings nor otherwise address whether or not RETC engaged in fraud, nor do we determine whether or not any documents were forged or falsified.

16

## DECISION

We address first the termination for cause in ASBCA No. 58383, then the appeals denying RETC's claim for breach of contract in ASBCA Nos. 58619 and 58620. For the reasons explained below, we deny the appeals and sustain the government's default termination.

## I. ASBCA No. 58383: Termination for Cause

The termination in this appeal is governed by FAR 52.212-4(m), CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010) (finding 3). The principles that apply under the FAR clauses that govern termination for default apply with equal force to terminations for cause under this clause. *Genome-Communications*, ASBCA Nos. 57267, 57285, 11-1 BCA ¶ 34,699 at 170,889; *General Injectables & Vaccines, Inc.*, ASBCA No. 54930, 06-2 BCA ¶ 33,401 at 165,593, *aff'd*, 519 F.3d 1360, *supplemented*, 527 F.3d 1375 (Fed. Cir. 2008).

Accordingly, the government bears the burden to prove that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987); *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022. If the government establishes a *prima facie* justification for termination, the burden shifts to the contractor to prove the default was excusable. *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312 (citing *Empire Energy Management Systems, Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,553).

### A. The Government Established a *Prima Facie* Justification for the Termination

FAR 52.212-4(m) allows the government to terminate for cause for any one of three reasons: (1) default by the contractor; or (2) failure of the contractor to comply with contract terms and conditions; or (3) failure to provide the government, upon request, with adequate assurances of future performance (finding 3). The government established a *prima facie* basis to terminate on all three grounds.

First, the government established a *prima facie* basis for default by anticipatory repudiation. To demonstrate an anticipatory repudiation, the government must show appellant "communicated an intent not to perform in a positive, definite, unconditional and unequivocal manner, either by (1) a definite and unequivocal statement by the contractor that it refused to perform or (2) actions which constitute actual abandonment of performance." *Production Services & Technology, Inc.*, ASBCA No. 53353, 02-2

17

BCA ¶ 32,026 at 158,293 (quoting *Jones Oil Co.*, ASBCA No. 42651 *et al.*, 98-1 BCA ¶ 29,691 at 147,150).

Through its words and deeds, RETC communicated an intent not to perform. Its 4 April 2012 letter notified the government that "RETC is cancelling contract W91B4N-11-D-7001" and "the contract will terminate May 3, 2012," which were definite, unconditional, and unequivocal statements that RETC refused to perform (finding 46). As such, they constituted a *prima facie* basis for default by anticipatory repudiation. *United Healthcare Partners, Inc.*, ASBCA No. 58123, 16-1 BCA ¶ 36,374; *Highland Al Hujaz Co.,* ASBCA No. 58243, 16-1 BCA ¶ 36,336. Similarly by reporting zero available assets from 4 April 2012 onward, RETC communicated an intent not to perform (finding 38). With no assets available, RETC could not be assigned new missions. Because the contract required RETC to maintain a minimum number of assets (finding 6), RETC's reporting of zero assets also constituted a *prima facie* failure to comply with contract terms and conditions, which is a separate basis for termination for cause (finding 3).

RETC argues it did not repudiate the contract, and characterizes its 4 April 2012 letter as a *proposal* that the government terminate the contract for convenience. It argues that it did not abandon performance because it continued to complete missions assigned prior to its 4 April 2012 letter. (App. br. at 13)

These arguments are without merit. RETC's 4 April 2012 letter does not indicate that it is a proposal; it unequivocally states that RETC "is cancelling our contract" (finding 46). That RETC continued to complete previously-assigned missions is of no moment. It continued to report zero assets available, making it unavailable for new missions (finding 38). This constitutes a refusal to perform in the future, which is a default by anticipatory repudiation. *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719; *DK's Precision Machining & Mfg.*, ASBCA No. 39616, 90-2 BCA ¶ 22,830. Moreover, RETC's attempt to recast its behavior as a proposal for a convenience termination cannot be reconciled with its contemporaneous conduct. In April 2012, after its third suspension, RETC asked when it would receive the "letter of default" (finding 48). Informed that termination would ensue if it failed to submit a corrective action plan, RETC did not submit a corrective action plan (finding 49). RETC behaved exactly as if it wanted a "letter of default."

Finally, the government established a *prima facie* basis to conclude that RETC failed to provide adequate assurances of future performance when such assurances were requested. The government issued a cure notice on 24 April 2012, giving RETC ten days to cure conditions the government said were "endangering the performance of the contract" (finding 52). RETC did not respond to the cure notice (finding 53). RETC's failure to respond to the cure notice constituted a failure to provide the government, upon request, with adequate assurances of future performance. *See Danzig v. AEC Corp.*, 224

18

F.3d 1333, 1338 (Fed. Cir. 2000) (holding that inadequate response to cure notice did not satisfy contractor's obligation to provide assurance of timely completion).

## B. RETC's Asserted Excuses Do Not Excuse its Default

The government having established a *prima facie* basis for the termination for cause, the burden shifts to RETC to prove its default was excusable. RETC makes several arguments.

### 1. The Government Did Not Breach the Contract

First, RETC contends that the government materially breached the contract by unilaterally changing the contract's invoicing procedures. RETC asserts that "the contract originally required" that RETC prepare its own invoices, but claims the 16 October 2011 Memorandum for the Record (MFR) directed that the government, rather than contractors, would prepare invoices. (App. br. at 12)

We reject this argument because the contract did not confer on RETC the right unilaterally to prepare its own invoices. Two contract provisions are relevant: PWS Subpart 6.6 and Paragraph K. PWS 6.6 addressed invoice *submission*, stating that "[t]he Contractor shall *provide* an invoice to the USG monthly" (emphasis added). It did not address how invoices were to be prepared, or who was to prepare them. (Finding 13) Paragraph K addressed invoice *preparation*, but did not confer a right on RETC to prepare its own invoices. Rather, it directed RETC to coordinate with the government in the preparation of invoices. (Finding 12)

Next, RETC contends that the government materially breached its duty of good faith and fair dealing by causing delays in the preparation of invoices. RETC claims these delays in turn caused its performance problems because RETC was unable to pay subcontractors, and unable, without the government's draft invoices, to detect that its subcontractor had been pilfering fuel (app. br. at 11-12).

We note that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *SIA Construction, Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986 (citing *Metcalf Construction Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). The implied duty of good faith and fair dealing is limited by the original bargain: it prohibits acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *See First Nationwide Bank v. United States*, 431 F.3d 1342, 1350 (Fed. Cir. 2005) (duty was breached by legislation that "changed the balance of contract consideration"). When the government is accused of breaching the duty of good faith and fair dealing, we examine the reasonableness of its

actions, considering all of the circumstances. *Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742.

The government acted reasonably and did not breach its duty of good faith and fair dealing. The government tried to coach RETC on how to prepare submissions (finding 29), and met with RETC's program manager to discuss invoicing problems (finding 35). Rather than delay or deny some pay requests, the government allowed RETC to "roll over" problematic TMRs to the next month, to allow more time for RETC to obtain supporting documents (finding 30).

To the extent there were delays in invoice preparation, RETC was primarily if not entirely at fault because it submitted late, incomplete, inconsistent, and inaccurate supporting documentation (findings 29, 32). RETC conceded that it submitted at least one TMR that had been forged by its subcontractor (finding 24), and the government doubted the authenticity of many other RETC submissions (findings 27, 36, 41, 50). At least some delay was attributable to the additional investigation required to authenticate RETC submissions (finding 31). The contract entitled the government to suspend payment while investigating "suspected fraudulent or altered" TMRs (finding 10).

Moreover, even if payments were delayed, RETC was still required to perform. A contractor is ordinarily responsible to provide sufficient financial resources for the performance of the contract; its financial incapacity is not a legitimate excuse for its failure to perform. *See Danzig*, 224 F.3d at 1339; *TGC Contracting Corp. v. United States*, 736 F.2d 1512, 1515 (Fed. Cir. 1984); *Cosmic Constr.* 88-2 BCA ¶ 20,623. A government failure to satisfy a payment obligation can excuse nonperformance if the nonpayment was a "controlling cause" of the contractor's failure to perform. *E.g.*, *Cosmic Constr.*, 88-2 BCA ¶ 20,623 at 104,242. That has not been shown here, because RETC has failed to prove that the government's delays, rather than RETC's own errors, caused RETC's performance problems (findings 32-33).

We are likewise unconvinced that invoicing delays prevented RETC from detecting that its subcontractor was stealing fuel. The only evidence that RETC offered on this point was the conclusory assertion of its program manager that "the only way that I could track performance was by the comments from the Government." (Finding 39; app. br. at 7-8, 12). No explanation was given as to *why* RETC was unable to detect its subcontractor's misconduct without government input (finding 39).

## 2. RETC Offers No Basis to Excuse its Performance Deficiencies

Finally, RETC argues that its performance deficiencies cited in the termination notice should be excused. It argues that two deficiencies – its failure to comply with the super lowboy specification and the theft of a government container and related submission of an allegedly-altered TMR – were corrected and should not be grounds for

20

submission of an allegedly-altered TMR – were corrected and should not be grounds for termination. RETC contends that three problems – the MRAP accident, RETC's failure to satisfy quality thresholds, and RETC's submission of additional TMRs that had allegedly been altered – were not its fault. (App. br. at 12-15)

Even if these performance deficiencies could be excused, it would not alter our holdings that RETC repudiated the contract, failed to comply with contract requirements, and failed to provide reasonable assurances of its future performance.[9] These deficiencies are grounds for a termination for cause under the termination provisions of FAR 52.212-4(m), regardless of any other performance failures.

In any event, in all but one instance[10], RETC's attempts to excuse its deficiencies are unavailing. The government reasonably concluded that the MRAP accident was RETC's fault, based upon the investigative finding that the accident occurred as a result of either driver error or mechanical failure, and RETC contemporaneously did not dispute this finding (findings 20-22). RETC's excuses for its failure to meet the PWS quality standards are unpersuasive (findings 42-43). Finally, RETC has not carried its burden to demonstrate that it should be excused for its subcontractors' thefts nor for a submission of a TMR that it concedes was forged by its subcontractor (findings 24, 36, 39).

Accordingly, we sustain the government's termination for cause and deny RETC's appeal in ASBCA No. 58383 (findings 62-63).

## II. ASBCA Nos. 58619 and 58620: Breach of Contract

Next we address RETC's appeals in ASBCA Nos. 58619 and 58620. Both appeals relate to the same claim. The appeal from a deemed denial was designated ASBCA No. 58619, while the appeal from the contracting officer's written decision denying that claim was designated ASBCA No. 58620 (finding 61).

In its claim, RETC contends that the government breached its duty of good faith and fair dealing by failing to properly administer the contract, failing to heed calls for assistance, failing to pay as required by the contract, failing to provide commercially practicable contract requirements, and improperly terminating the contract for cause rather than for convenience (finding 60). These contentions are the same as those raised in RETC's challenge to the termination for cause; indeed, similarly mentioned in

---

[9] It is not necessary to reach the question of whether RETC submitted false or fraudulent documents in support of payment, and we expressly do not do so (finding 62). *See Laguna Construction Company v. Carter*, 828 F.3d 1364 (Fed. Cir. 2016).

[10] RETC appears to have resolved the government's concern regarding its compliance with the super lowboy requirement by its submission of an acceptable corrective action plan (finding 19).

RETC's post-hearing brief and reply brief, no additional arguments have been presented in support of its claim that were not presented in defense of the termination.

We have already addressed, and rejected, RETC's arguments in the context of the termination. Accordingly, these appeals are denied.

## CONCLUSION

The appeals are denied.

Dated: 12 October 2017

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

DIANA S. DICKINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58383, 58619, 58620, Appeals of Rashed Elham Trading Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

23